**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| GREGORY BOWYER, *et al.*, |
| Plaintiffs, |
| v. |
| DISTRICT OF COLUMBIA, *et al.*, |
| Defendants. |

Civil Action No. 09-319 (BAH)

Judge Beryl A. Howell

<u>**MEMORANDUM OPINION**</u>

The plaintiffs Gregory Bowyer and Gerald Pennington are two African American firefighters in the District of Columbia who bring this action against the defendants District of Columbia ("the District"), Dennis L. Rubin, and Gary Palmer, Jr. under 42 U.S.C. § 1983 and the District of Columbia Whistleblower Protection Act, D.C. Code §§ 1-615.51, *et seq.* Common to all three of their claims is the plaintiffs' contention that the defendants retaliated against them for speaking out about a variety of issues within the District of Columbia Fire and Emergency Medical Services ("DCFEMS"). Over the course of nearly two years, the plaintiffs allege that they complained within and outside the DCFEMS about what they believed was racial hostility and discrimination, the mishandling and subsequent cover-up of fire investigations, and general professional misconduct. The plaintiffs now claim that their complaints were met with swift and multifarious retaliation by the defendants in the form of disciplinary actions, removal of privileges and responsibilities, and other attempts to ostracize and isolate the plaintiffs from the rest of their unit. All three defendants have moved for summary judgment.

## I.      BACKGROUND

The plaintiffs are both "career firefighter[s] and fire investigator[s] currently employed by the DCFEMS."  Compl. for Declaratory, Injunctive, & Monetary Relief & Jury Demand ("Compl.") ¶¶ 7–8, ECF No. 1.  In particular, both of the plaintiffs worked for many years, beginning in 2001, as fire investigators in the Fire Investigations Unit ("FIU"), *id.* ¶ 12, which is a specialized unit within the DCFEMS responsible for investigating the origins and causes of all fires that occur in the District, investigating arsons, and enforcing compliance with fire-related laws and regulations.[1]

All parties agree that from 2003 to 2007, the racial makeup of the FIU was 100% African American.  Def. D.C.'s Statement of Undisputed Facts ("D.C. Facts") ¶ 8, ECF No. 49-1; Pls.' Statement of Disputed Facts in Response to D.C. ("Pls.' D.C. Facts") ¶ 8, ECF No. 55-1.[2]  In April 2007, defendant Rubin became the Fire Chief of DCFEMS, and Rubin promoted defendant Palmer to the position of Deputy Chief and Fire Marshal.  D.C. Facts ¶ 9; Pls.' Mem. of P. & A. in Opp'n to Def. D.C.'s Mot. Summ. J. ("Pls.' D.C. Opp'n") at 2, ECF No. 55.  The plaintiffs claim that defendant Rubin "implemented a race based policy under which he assigned more white personnel to the FIU to increase the percentage of white investigators."  Pls.' D.C. Facts ¶ 9.  To effectuate this policy, the plaintiffs claim that the defendants "relaxed the requirements and standards for promotion to the FIU in order to ensure the addition of the white candidates it assigned to the unit."  *Id.*  More particularly, the plaintiffs claim that "[n]one of the white firefighters whom the Department assigned to the [FIU] pursuant to this policy met the

---

[1] *See* DCFEMS Office of the Fire Marshal, http://fems.dc.gov/DC/FEMS/Divisions/Office+of+the+Fire+Marshal (last accessed Dec. 20, 2012).

[2] Although the plaintiffs admit that the composition of the FIU was 100% African American in 2007, *see* Pl.'s D.C. Facts ¶ 8, they allege in their Complaint that composition of the FIU was 70% African American in 2007.  *See* Comp. ¶ 15.  The Court notes this discrepancy and relies, for purposes of the pending motions for summary judgment, on the statements of facts submitted by the parties.

qualification requirements for membership in the [FIU]," and the white firefighters in the FIU "have failed portions of the written, physical, or psychological examinations required for assignment to the position of fire investigator."  Compl. ¶ 13.  With respect to the alleged relaxation of requirements and standards in the FIU, the plaintiffs claim specifically that the defendants (1) lowered the minimum number of years of experience required to become an investigator, from five years to three years; (2) increased the maximum allowable body fat percentage for fire investigators; (3) loosened the criminal background checks and psychiatric checks for new investigators; (4) changed the DCFEMS shift work and division to attract white candidates; (5) eliminated the formerly required 180-day investigator-training course and exam; and (6) assigned overtime disproportionately to white members of the FIU.  Pls.' D.C. Opp'n at 36–37.

As a result of this alleged policy, the plaintiffs claim that the presence of African Americans in the FIU after 2007 dropped precipitously to 40%.  *See* Compl. ¶ 15; *see also* Pls.' Ex. 19, ECF No. 55-2 (purporting to list "Active Members in DCFEMS FIU").  The plaintiffs allege that "[t]he policy of assigning new personnel to the FIU was based solely on race," that "all of the supervisors in FIU are [now] white," and that, in addition to the racial composition, the defendants' alleged policy has "also resulted in a substantial decline in DCFEMS' ability to determine accurately the cause and origin of fires and to perform accurate follow-up investigations of potential arsons . . . given the assignment of unqualified personnel [to] this unit."  Compl. ¶ 15.  It is this alleged "assignment of unqualified [white] firefighters to important roles in FIU" and the resulting alleged "serious problems with fire investigations" that is the starting point for the events that are at issue in this case.  *See id.* ¶¶ 16–17.

The plaintiffs eventually filed internal Equal Employment Opportunity ("EEO") complaints with the DCFEMS in June 2008 related to this alleged discriminatory policy, in which the plaintiffs complained of racial discrimination in the FIU, race-based assignments, and preferential treatment for white investigators. *See id.* ¶ 37; *see also* Pls.' Exs. 37–38, ECF No. 55-2. The plaintiffs also say that they repeatedly raised concerns to their superiors about the racial disparities within the FIU and the deleterious effects that the disparities were having upon fire investigations. *See, e.g.*, Pls.' D.C. Opp'n at 18–19.

Beginning sometime in 2007, in addition to the explicitly race-based issues, the plaintiffs allege that they began raising concerns to their superiors about a broad range of other perceived improprieties within the DCFEMS, and the FIU in particular. *See, e.g.*, Pls.' D.C. Opp'n at 18–26. The plaintiffs allege that they raised their concerns to "their direct supervisor Sergeant Phillip Proctor, Defendant Palmer, Defendant Rubin, and Assistant Fire Chief Brian Lee." Compl. ¶ 17. The Court will discuss in further detail the issues that arose within the FIU, how the plaintiffs say they spoke out about those issues, and the alleged retaliation that followed.

### A.      Alleged Misconduct Within the FIU

During 2006, a number of firefighters were temporarily detailed to the FIU, and DCFEMS hired two outside instructors to provide instruction on fire investigation to the newly detailed firefighters. Def. D.C.'s Supplemental Statement of Undisputed Facts ("D.C. Supp. Facts") ¶¶ 21–24, ECF No. 59-2. These outside instructors provided two weeks of instruction and administered an exam to the firefighters at the end of the two weeks. *Id.* ¶ 24. Sgt. Proctor also provided an additional week of training but decided not to administer any exam. *Id.* ¶ 25. Before deciding not to administer an exam, Sgt. Proctor inadvertently left a copy of an exam he planned to administer in a computer room printer, which was then obtained by a number of the

detailed firefighters. *Id.* ¶ 26. After learning of this incident, Sgt. Proctor decided not to administer a test; informed his colleague, Lieutenant Robert Pearson, of the incident; and as a result Lt. Pearson administered a test to the detailed firefighters that differed from the one prepared by Sgt. Proctor. *Id.* The defendants maintain that, in addition to the fact that the administered test was different than the test obtained by the firefighters, the administered test also "had no bearing on whether these detailed firefighters would be admitted into FIU" and did not "affect[] the assignment or pay of the temporary fire investigators." *Id.* ¶¶ 27, 36. A subsequent internal investigation of the matter concluded that Sgt. Proctor did not assist the incoming fire investigators in cheating on the exam. *Id.* ¶ 34. Nevertheless, the plaintiffs say that they complained to defendant Palmer that Sgt. Proctor had "helped white candidates cheat on the examinations required to become fire investigators." Pls.' D.C. Opp'n at 4; Compl. ¶ 18.

In addition to the alleged cheating incident, the plaintiffs say that they complained to their superiors at the DCFEMS in 2007 about the conduct of Lieutenant Craig Duck, who was at that time the supervisor of the FIU. *See* Compl. ¶ 19. According to the plaintiffs, Lt. Duck was engaging in two separate types of misconduct. First, he was allegedly attempting to create a hostile work environment for African Americans in the FIU by referring to the white investigators as his "team," reassigning follow-up investigations exclusively to these white investigators, and pressuring white investigators to stop associating with "Pennington's team," which the plaintiffs claim referred to the African American investigators. *Id.* ¶¶ 19–20. The plaintiffs allege that Lt. Duck's behavior "created an atmosphere of tension and mistrust within the FIU," which allegedly made it "nearly impossible for [the plaintiffs] to successfully complete the origin-and-cause investigations to which they were assigned." *Id.* ¶ 20. The plaintiffs specifically contend that they complained to Lt. Duck directly on September 28, 2007, about the

preferential treatment being given to white investigators, but the plaintiffs allege that Lt. Duck

"denied Plaintiffs' accusations, and the preferential treatment of white members of the FIU

continued." *Id.* ¶ 21.

The plaintiffs also say that they complained about instances of what could be termed

fraud, waste, or abuse by Lt. Duck.  In June 2007, the plaintiffs allege that they complained to

defendant Palmer, Sgt. Proctor, and Assistant Fire Chief Lee that "Lt. Duck was manipulating

fire-investigation data and reports in order to justify the purchase of newer or fancier equipment,

which he referred to as 'toys.'"  Compl. ¶ 29.  The plaintiffs say that they reported that "Lt. Duck

overstated the utilization of particular pieces of equipment in hopes of hastening their

replacement."  *Id.*; *see also* Pls.' D.C. Opp'n at 22 (contending that Lt. Duck "instruct[ed]

subordinates to say that a tank of bottled air had been used for four hours when it had actually

been used for ten minutes" and "list[ed] use of equipment that the unit never had").

### B.  Allegedly Mishandled Fire Investigations

The bulk of the plaintiffs' alleged complaints to their superiors centered on what they

believe was a series of mishandled fire-related investigations from 2007–2008.  As discussed

above, the plaintiffs generally attribute these "botched" investigations to what they claim was a

race-based policy of bringing in inexperienced and unqualified white firefighters to the FIU to

conduct fire investigations.  *See* Compl. ¶¶ 15–16; *see also* Pls.' D.C. Opp'n at 12.

#### 1.  *Eastern Market Fire*

The first and most high profile of these fire investigations began on April 30, 2007, when

a three-alarm fire destroyed the butcher, bakery, and fishmonger stalls at the District's historic

Eastern Market.  Compl. ¶ 23. *See generally* Keith L. Alexander, Michelle Boorstein, & Allison

Klein, *Beloved Eastern Market, Library in Georgetown Ravaged by Fires*, WASH. POST, May 1,

2007, at A1.  Lt. Duck assigned fire investigator Keith Byrd—whom the plaintiffs allege was "an

inexperienced white investigator"—to lead the investigation.  Compl. ¶ 23.  Within 24 hours of

the blaze, Chief Rubin commented to the press that "he was '90 percent' sure last night that the

Eastern Market fire was accidental, probably caused by an electrical problem."  Alexander, *et al*.,

*supra*; *see also* Compl. ¶ 23.  Byrd subsequently issued a report that came to the same

conclusion:  the fire was an accident.  Compl. ¶ 23.

The plaintiffs allege, however, that the DCFEMS "had evidence suggesting that a serial

arsonist had intentionally set the Eastern Market fire," namely, the fact that the DCFEMS "had

recently extinguished an unusually large number of fires set in dumpsters within a four-block

radius of Eastern Market, including several dumpster fires on the same night as the Eastern

Market fire."  *Id.* ¶ 24.  Furthermore, a report issued by the federal Bureau of Alcohol, Tobacco,

Firearms, and Explosives ("ATF") in the months after the fire ruled out electrical causes.  *Id.*

The plaintiffs allege that, after the ATF report was released, "Sgt. Proctor changed Mr. Byrd's

original fire report from an electrical cause to an undetermined cause."  *Id.*  The plaintiffs

believed that the fire was intentionally set, and they claim that Sgt. Proctor shared their belief but

"directed them to keep quiet because Defendant Rubin had already told the media the fire's

origin was electrical."  *Id.*  The plaintiffs also allege that a suspect in the Eastern Market fire was

arrested in May 2007 but was never charged.  *Id.* ¶ 25.

In December 2007, media reports indicated that the cause of the Eastern Market fire was

still publicly considered a "continuing mystery," citing that ATF had ruled out electrical causes,

the DCFEMS officially considered the cause "undetermined," and no evidence had surfaced of

arson.  *See* Elissa Silverman, *Eastern Market Fire Still at Issue ATF, D.C. Fire Chief Disagree*

*on Cause*, WASH. POST, Dec. 23, 2007, at C1.  The plaintiffs allege, however, that their own

investigation "led them to conclude the fire was caused by arson."  Compl. ¶ 25.  In the end, an

eleven-month investigation into the Eastern Market fire in 2009, conducted by the DCFEMS and "other experts in the field of fire and forensic investigations" concluded that the fire was "a result of an electrical faulting of the outside electrical circuit supplying the trash compactor." *See* Gov't of the Dist. of Columbia, Fire & Emergency Servs. Dep't, Supplemental Fire Investigation Report 2 (Dec. 16, 2009), *available at* http://www.washingtonpost.com/wp-srv/metro/documents/easternmarketfire.pdf.  This 2009 report appears to have been the final word on the matter.

### 2.      *Permit and Fire Code Violations*

While the Eastern Market fire investigation was ongoing, in late June or early July 2007, the plaintiffs say that they informed defendant Palmer that Sgt. Proctor "had engaged in misconduct during the inspection of a nightclub, the K St. Lounge, by allowing the business to avoid penalties for clear safety and permit violations."  Compl. ¶ 29.  The plaintiffs elaborate in their briefing that the nightclub was "being operated over capacity" and the plaintiffs say that, as a part of the "club zone taskforce," they "found numerous violations at the club, ultimately totaling $150,000 in fines."  Pls.' D.C. Opp'n at 22.  The plaintiffs further contend, however, that "[Sgt.] Proctor's interference and conduct resulted in the owner paying reduced . . . fines of $17,000."  *Id.*  After this incident, the plaintiffs were removed from the club zone task force.  *See* Decl. of Gregory Bowyer ("Bowyer Decl.") ¶ 18, ECF No. 55-2; Decl. of Gerald Pennington ("Pennington Decl.") ¶ 22, ECF No. 55-2.

In June 2007, a third incident occurred that the plaintiffs believe was mishandled by the DCFEMS.  The DC Fire Marshal's office received a complaint of illegal use of propane at the Barry Farm's Goodman-League basketball tournament in Southeast D.C and sent the plaintiffs to investigate.  *See* Pls.' D.C. Opp'n at 7; Pls.' Ex. 3, at 292–93, ECF No. 55-2.  The plaintiffs documented that food vendors at the tournament were using propane tanks without the required

permit and were using the tanks "in a very reckless and negligent manner" by storing the tanks "a couple of feet from gasoline in cans . . . near children and civilians." Pls.' Ex. 3, at 293–94. Initially, the plaintiffs let the vendors off with a warning, notifying them that they needed to obtain the proper permits, but when they returned later, the plaintiffs claim that the same violations persisted. *Id.* at 294–95. The plaintiffs and the police officer accompanying them decided that arresting the event organizer was imprudent, given the atmosphere of the event, and they tried instead to get his information so that an arrest warrant could be issued later. *Id.* at 297. When the event organizer refused to provide any information to the plaintiffs, Pennington "signal[ed] an alert that there was increasing tension as a result of the situation." Pls.' D.C Opp'n at 7. What followed between plaintiff Bowyer and the event organizer remains unclear.

The next day, however, the event organizer made a formal complaint about plaintiff Bowyer to defendant Palmer, and Palmer instructed Bowyer to write a "detailed report, point by point, addressing the actions at Barry Farms Basketball tournament." *See* Pls.' Ex. 32, ECF No. 55-2; Pls.' D.C. Opp'n at 7. The plaintiffs also allege that, after the vendor filed this complaint, defendant Palmer "subject[ed] them to investigations by Internal Affairs and the Office of the Inspector General ('OIG')" and "caus[ed] a Metropolitan Police Department detective to issue a baseless warrant for Mr. Bowyer's arrest." Compl. ¶ 29. The plaintiffs allege that Bowyer later met with D.C. Councilmember Phil Mendelson "to discuss the Department's mishandling of the incident in its decision not to pursue an arrest warrant for [the event organizer] and to raise safety concerns about illegal propane tank usage at Barry Farms." Pls.' D.C. Opp'n at 8.

### 3. *The Bridgewater Case*

The next incident that the plaintiffs claim was mishandled began in July 2007 when a man named Timothy Bridgewater sold illegal fireworks to plaintiff Pennington. *See* D.C. Facts ¶¶ 11–12. A search of Bridgewater's vehicle uncovered illegal fireworks as well as a handgun,

resulting in his arrest.  *Id.*  Although plaintiff Pennington believed that the owner of the fireworks stand should also be arrested because he had directed Pennington to Bridgewater to purchase the illegal fireworks, D.C. Assistant Attorney General ("AAG") Lynette Collins counseled against such an arrest because she did not believe there was sufficient probable cause. *Id.* ¶¶ 13–15.  An FIU investigator named James Taylor "papered" the investigation with several documents, which included a series of photographs from the scene of the Bridgewater arrest taken by FIU Investigator Scott Ford and Firefighter Keith Byrd.  *Id.* ¶¶ 17–18.[3]  The documents collected by Taylor, however, did not include photographs taken by plaintiff Bowyer at the scene with his personal camera that showed that the firearm in Bridgewater's vehicle was located in a book bag in the rear seat of the vehicle.  *See* D.C. Facts ¶ 19; Pls.' D.C. Facts ¶ 19.

According to AAG Collins, plaintiff Pennington expressed concerns to her about the way Investigator Taylor was handling the investigation, and Pennington later chose to recuse himself from the Bridgewater case "based on his belief that Taylor should not be involved."  Decl. of Lynette Collins ("Collins Decl.") ¶¶ 15–18, 21, ECF No. 49-2.  The plaintiffs, however, maintain that Pennington wanted to recuse himself from testifying "because of the underlying merits in the case" and his concerns about "the integrity of the case."  Pls.' D.C. Facts ¶ 21.  In particular, the plaintiffs say they raised what they believed were a number of "holes in the case," *id.* ¶ 22, including:  (1) the photographs taken by plaintiff Bowyer of the scene, using his personal camera, were absent from the case file, *see* Pls.' Ex. 3, at 127; (2) there were discrepancies with the chain of custody for the handgun found in Bridgewater's car, *see id.* at 128; and (3) "the

---

[3] Incidentally, the plaintiffs state that they "encouraged the use of FIU Investigator Taylor to paper the case since he was a junior member and it was a way for [him] to get experience in the process."  Pennington Decl. ¶ 51.  This encouragement by the plaintiffs is difficult to reconcile with one of the central theories of the plaintiffs' case:  that the defendants acted improperly by assigning inexperienced, white investigators to investigate and paper cases.

fireworks, cash and book bag in the case were missing from the evidence locker," Pls.' D.C. Facts ¶ 31.

The Assistant United States Attorney ("AUSA") assigned to prosecute Bridgewater, Matt Graves, eventually decided to dismiss the case. Collins Decl. ¶ 20; Pls.' D.C. Opp'n at 9. AAG Collins avers that AUSA Graves indicated to her that he decided to dismiss the charges against Bridgewater "because of infighting involving FIU investigator Pennington and the lack of cooperation between FIU investigators." Collins Decl. ¶ 22. The plaintiffs, however, contend that "it is highly likely that AUSA Graves dismissed the charges because of the holes in the case that Investigator Pennington brought to his attention." Pls.' D.C. Facts ¶ 22.

Despite the federal government's decision not to prosecute, the D.C. Office of the Attorney General ("OAG") decided to pursue criminal charges of its own against Bridgewater, and AAG Collins was assigned to prosecute the case. Collins Decl. ¶¶ 23–24. That trial began on February 20, 2008. *Id.* ¶ 27. AAG Collins avers that she was unaware of the photographs taken by plaintiff Bowyer on his personal camera at the scene of Bridgewater's arrest. *Id.* ¶ 39. The plaintiffs dispute this statement and contend that "AAG Collins was aware of the existence of Plaintiff Bowyer's photographs but was attempting to prosecute the Bridgewater case without this evidence." Pls.' D.C. Facts ¶ 29.[4] Regardless, in a pretrial hearing in the Bridgewater case, defense counsel notified the court that the government had failed to disclose the photographs taken by plaintiff Bowyer. Collins Decl. ¶ 34. AAG Collins avers that, in a break during this same pretrial hearing, plaintiff Bowyer "disclosed to [her], for the first time, that he had used his personal camera to take photos of the scene of the Bridgewater offense." *Id.* ¶ 42. The

---

[4] In support of their assertion, the plaintiffs contend more specifically that plaintiff Pennington told AAG Collins about the photographs "in a witness conference" in AAG Collins's office and that plaintiff Bowyer "had given the photographs to FEMS General Counsel Marceline Alexander and they appeared during the Bridgewater debriefing on the projector screen for Collins and all in the debriefing at the time to see." Pls.' D.C. Facts ¶¶ 29, 32.

photographs were turned over to defense counsel, but the court also conducted a hearing on the issue of the photographs. *See id.* ¶¶ 43, 45.  At the hearing, plaintiff Bowyer "testified that he had previously informed [AAG Collins], his superiors and AUSA Graves of the photographs of the scene taken by him." *Id.* ¶ 46.

The parties dispute the veracity of plaintiff Bowyer's testimony in the Bridgewater case regarding the photographs.  The plaintiffs insist that the hearing testimony was truthful, and plaintiff Bowyer even filed an ethics complaint against AAG Collins with the D.C. Bar Counsel for what the plaintiffs characterize as "her unethical conduct during the Bridgewater trial and falsely accusing [Bowyer] of perjury."  Pls.' D.C. Facts ¶ 37.[5]  The defendants and AAG Collins, however, insist that the testimony was false.  After the hearing testimony was given, AAG Collins filed a complaint about plaintiff Bowyer with AAG Barbara Chesser and AAG Collins's superior at the OAG, Deputy Attorney General Robert Hildum.  *See* D.C. Facts ¶¶ 35, 39.  Based on AAG Collins's complaints and similar complaints from another prosecutor in a separate case discussed below, the OAG decided to bar both of the plaintiffs from testifying in future OAG prosecutions (known as being placed on the "Lewis List"), and Hildum informed defendant Rubin of this decision in person on August 21, 2008 and via letters dated October 27–28, 2008. *See* Pls.' D.C. Facts ¶ 39; Decl. of Dennis L. Rubin ("Rubin Decl.") ¶¶ 7–13, ECF No. 59-3; *see also* Pls.' Exs. 34–35, ECF No. 55-2.

### 4.    *The K.A. Case*

The final investigation relevant to the plaintiffs' claims was of a house fire that occurred on June 18, 2008 at 317 L Street N.E. in Washington D.C.  *See* D.C. Facts ¶¶ 40, 41.  The fire was at the house of a juvenile, K.A.  *Id.* ¶ 41.  The plaintiffs allege that "DCFEMS had initially

---

[5] This complaint was later dismissed by the D.C. Office of Bar Counsel due to insufficient evidence.  *See* Pls.' Ex. 59, at 9, ECF No. 55-2.

assigned an inexperienced investigator to head up the fire investigation," but "[a]fter the fire attracted public attention, Defendant Palmer assigned Mr. Bowyer as the lead follow-up investigator in order to close the case quickly."  Compl. ¶ 33.  Plaintiff Bowyer testified in his deposition that the investigator who had done the origin-and-cause investigation, Taunja Kittrell, "botched" the investigation because she "hadn't had the basic fire investigation [training]."[6] Pls.' Ex. 3, at 188–89.  As a result of Kittrell's alleged lack of training, according to plaintiff Bowyer, "[s]he wasn't aware of the area of origin," she "wasn't aware of the standard methodology for investigating fires," and she "didn't understand basic fire dynamics."  *Id.* at 190.  Plaintiff Bowyer further testified that, while at the scene of the fire, he observed that citizens were being allowed to walk in and out of the scene, items and debris were improperly removed from the scene while the investigation was taking place, evidence was contaminated after it was removed from the house, and the scene was not photographed properly.  *See id.* at 192–95.  Plaintiff Bowyer says that he notified defendant Palmer, after the completion of the origin-and-cause investigation by Firefighter Kittrell, that "we may have problems with the arson case based on the botched investigation."  *Id.* at 188.

After the initial origin-and-cause investigation by Kittrell, the plaintiffs were assigned to conduct the follow-up investigation.  *See* Compl. ¶ 33.  According to AAG Mary O'Connor, who prosecuted the K.A. case, K.A. confessed twice to setting the fire:  once when the plaintiffs interviewed K.A. at K.A.'s home and once when K.A. was being questioned at the Youth Division.  *See* Decl. of Mary O'Connor ("O'Connor Decl.") ¶ 5, ECF No. 49-2.  The plaintiffs, however, maintain that "[t]he Plaintiffs only obtained one confession at the Youth Division" and

---

[6] Taunja Kittrell is an African American female.  *See* Pls.' Ex. 3, at 189.

"[a]ny statements made at K.A.'s home were admissions."[7]  Pls.' D.C. Facts ¶ 45.[8]  In any event,

K.A. moved to suppress the confession, and both of the plaintiffs testified at the suppression

hearing:  plaintiff Pennington for the government, and plaintiff Bowyer for the defense.  *See*

O'Connor Decl. ¶¶ 9–10.  The defendants and AAG O'Connor maintain that the testimony at the

suppression hearing established that K.A. asked for an attorney while being questioned by the

plaintiffs and that the plaintiffs continued to question K.A. despite his requests for an attorney.

*See* D.C. Facts ¶¶ 52–53; O'Connor Decl. ¶¶ 12–13.  The plaintiffs concede that "[d]uring K.A.'s

responses to questions he would refer to his lawyer," but contend that K.A. "never invoked his

right to counsel."  Pls.' D.C. Facts ¶ 52.  Regardless, the parties agree that the presiding judge

suppressed K.A.'s confession.  *See id.* ¶ 55; D.C. Facts ¶ 55.  The plaintiffs deny, however, the

defendants' and AAG O'Connor's statements that the basis for the suppression was that the

presiding judge determined that the plaintiffs had violated K.A.'s *Miranda* rights.  *See* Pls.' D.C.

Facts ¶ 55; *see also* D.C. Facts ¶ 55; O'Connor Decl. ¶ 14.  Rather, the plaintiffs maintain that

"[i]t was not the statements made by the Plaintiffs that caused the evidence to be suppressed but

rather the lack of evidence presented by AAG O'Connor at trial."  Pls.' D.C. Facts ¶ 55.

---

[7] It is not clear what difference the plaintiffs seek to draw between "admissions" and a confession.  As plaintiff Bowyer states in his sworn declaration, "K.A. made the admission that he had set the fire we were investigating." Bowyer Decl. ¶ 83.  Such an admission is a confession, although the plaintiffs indicate that K.A. spontaneously made the admission "in an outburst that seemed to be triggered when he was asked why his aunt called MPD about the BB gun she found in his pants," *id.*, suggesting that it was not in response to interrogation. *See, e.g., Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980) (*Miranda* rights only apply "where a suspect in custody is subjected to interrogation," and "interrogation" refers "not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect").

[8] The plaintiffs and AAG O'Connor also take diametric positions regarding if and when the plaintiffs informed O'Connor about the statements made by K.A. at K.A.'s home.  According to the plaintiffs, Pennington "advised [O'Connor] of both the admissions made at the house and the confession at the Youth division," and although he "tried to tell O'Connor about the admissions that had been made by K.A. at the house," his "concerns were ignored." Pls.' D.C. Facts ¶ 46.  AAG O'Connor, however, avers that neither of the plaintiffs told her about the confession made at K.A.'s home, and she maintains that she did not discover the existence of the first confession until she spoke with her colleague at the OAG.  *See* O'Connor Decl. ¶¶ 6–7.  AAG O'Connor also avers that she "attempted to inquire about the confessions from Investigator Bowyer, but he told me that he could not talk to me."  *Id.* ¶ 8.

On June 21, 2008, after the plaintiffs had interviewed K.A., AAG Chesser informed the plaintiffs that they were no longer assigned to the K.A. case because they had been put on the Lewis List by the OAG, as discussed above.  *See* Pls.' Ex. 4, at 180; Pls.' Ex. 52, ECF No. 55-2; Pls.' D.C. Opp'n at 11.  At trial in August 2008, plaintiff Bowyer was subpoenaed to testify on behalf of the defense as "an expert with regards to general fire origin and cause."  Pls.' D.C. Facts ¶ 56; O'Connor Decl. ¶ 15.  According to the defendants and AAG O'Connor, plaintiff Bowyer "testified that he could not determine how the fire was started," a conclusion that was inconsistent with a standard form (PD 379) signed by plaintiffs Bowyer and Pennington, which stated that "'scene investigations revealed that fire was intentionally set.'"  D.C. Facts ¶¶ 57–59; O'Connor Decl. ¶¶ 16–18.  The plaintiffs contend, however, that plaintiff Bowyer did not testify as the defendants describe because Bowyer "did not do the origin and cause investigation" and thus "he did not change his determination because he did not make a determination in the first place and was not asked to do so."  Pls.' D.C. Facts ¶¶ 57, 60.  Further, although the plaintiffs do not appear to contest the contents of the PD 379 form or that they signed that form, they contend instead that "Bowyer signed the PD-379 because he was ordered to do so by Defendant Palmer." *Id.* ¶ 58.[9]  In the end, the District's arson prosecution of K.A. was unsuccessful, O'Connor Decl. ¶ 20, and formal disciplinary charges were subsequently filed against plaintiff Bowyer for his testimony.  The charges stated, *inter alia*, that the "statements you made at trial directly contradict the PD 379 that you completed and signed on June 20, 2008, and therefore, constitutes perjury."  Pls.' Ex. 43, at 5, ECF No. 55-2.[10]

---

[9] The plaintiffs also aver that Sgt. Proctor "ordered Investigator Kitrell [sic] to change the fire report to fit the confession given by K.A. at the Youth Division."  Bowyer Decl. ¶ 94.

[10] The record is unclear regarding the present status of these disciplinary charges.

C.     **Alleged Retaliation by DCFEMS**

The plaintiffs assert that the defendants retaliated against them after they spoke out about the instances of alleged misconduct and incompetence discussed above, and it is this alleged retaliation that is the nub of the plaintiffs' case.  First and most generally, the plaintiffs contend that, as they began to speak out in 2007 about issues of racial discrimination, "botched" investigations, and other perceived misconduct within the DCFEMS, they were subjected to a "hostile work environment."  *See* Compl. ¶¶ 20, 22, 28, 31, 42; Pls.' D.C. Opp'n at 4, 12; Bowyer Decl. ¶ 17; Pennington Decl. ¶ 21.  According to the plaintiffs, this hostile work environment consisted of a racially divided FIU and the isolation of the plaintiffs from the rest of the Unit based on perceived disloyalty.  *See* Compl. ¶¶ 20, 31.

According to the Complaint, "[t]he retaliation against Plaintiffs began in the early spring of 2007 when Defendant Rubin promoted Defendant Palmer to the position of Fire Marshal." Compl. ¶ 18.  At that time, the plaintiffs say that they informed defendant Palmer about Sgt. Proctor helping white firefighters cheat on the fire investigator exam "in furtherance of the Department's racially discriminatory policy to increase the numbers of white fire investigators regardless of their qualifications."  *Id.*; *see also* Pls.' Ex. 6, at 312, ECF No. 55-2.  On March 26, 2007, after the plaintiffs say they had notified defendant Palmer about Sgt. Proctor's alleged cheating, the plaintiffs claim that Lt. Duck removed them from the Burned Vehicle Initiative ("BVI"), a program established by the plaintiffs in January 2007 after they had noticed a rise in vehicle fires.  Pls.' D.C. Opp'n at 5, 28; *see also* Pls.' Ex. 2 ¶ 6, ECF No. 55-2.  Lt. Duck took over the BVI, and according to the plaintiffs he "reassigned these investigations to the white firefighters who were joining FIU."  Compl. ¶ 19.

Next, the plaintiffs contend that, after they "raised concerns" about the origin-and-cause investigation for the Eastern Market fire on April 30, 2007 and the alleged manipulation of records by Lt. Duck for the purpose of obtaining new equipment for the FIU in June 2007, the defendants changed the plaintiffs' shift structure in retaliation.  Pls.' D.C. Opp'n at 4, 28; Pls.' Ex. 1 ¶ 18, ECF No. 55-2.  In particular, on June 16, 2007, the plaintiffs allege that the defendants changed their work schedule "from a Monday–Friday day shift to a 24 hours on, 72 hours off schedule."  Compl. ¶ 29; *see also* Pls.' D.C. Opp'n at 28.  Although defendant Palmer maintains that this shift change applied to the entire FIU "[t]o bring it in line with the rest of the department" because of payroll and overtime issues, Defs.' Ex. O at 293, ECF No. 49-2, the plaintiffs contend that this shift change was retaliatory and that it "made it virtually impossible to conduct any investigations," Compl. ¶ 29.

The plaintiffs also say that in September 2007 they complained to their superiors in the FIU about Lt. Duck's alleged preferential treatment toward white firefighters and his alleged practice of fomenting a racial divide in the FIU by encouraging white firefighters to become loyal to his "team" rather than that of the African American firefighters.  *See id.* ¶ 21; Pls.' D.C. Opp'n at 4; Pls.' Ex. 6, at 173–75.  In addition to alleging that Lt. Duck ignored their complaints, Compl. ¶ 21, the plaintiffs also contend that, after they made these complaints, (1) "the FIU began to deny Plaintiffs the opportunity to attend training courses that other white FIU members received;" (2) "[Lt.] Duck assigned fire investigations to inexperienced white investigators instead of the Plaintiffs;" and (3) "[Lt.] Duck continued to pressure white investigators to stop associating with 'Pennington's team' and instead stay loyal to his 'team,'" Pls.' D.C. Opp'n at 4– 5.  For his part, defendant Palmer explained in his deposition that a member of the department other than the plaintiffs complained to him about Lt. Duck's "team" mentality, and as a result

Palmer instructed Lt. Duck to refrain from speaking in those terms because firefighters may take it the wrong way. *See* Pls.' Ex. 6, at 173–75.  According to Palmer, after he addressed the matter with Lt. Duck, the issue never came to his attention again. *See id.* at 175.

In the first week of November 2007, as discussed above, the plaintiffs allege that they both complained about what they perceived to be numerous problems with the Bridgewater fireworks case. *See* Compl. ¶ 30; Pls.' D.C. Opp'n at 29; Pennington Decl. ¶¶ 54, 56–57; Pls.' Ex. 3, at 184.  Less than a week later, on November 5, 2007, plaintiff Pennington says that defendant Palmer warned him not to recuse himself from the case or else he would face disciplinary action. *See* Pls.' Ex. 4, at 140.  A short time after the plaintiffs say they complained about the Bridgewater case, they also claim that (1) they were both removed from all follow-up investigations; (2) defendant Palmer revoked their take-home car privileges, call-back privileges,[11] and computers with law enforcement capabilities; and (3) they were moved to an office space where the K-9 unit dogs were housed. *See* Compl. ¶ 30; Pls.' D.C. Opp'n at 9, 29; Pls.' Ex. 3, at 272; Pls.' Ex. 4, at 266–67.  The plaintiffs assert that the defendants took these actions in retaliation for the plaintiffs raising concerns about the Bridgewater case. *See* Pls.' D.C. Opp'n at 29.

Related to the Bridgewater fireworks case as well as the K.A. arson case, the plaintiffs claim that AAG Collins "falsely reported" that the plaintiffs had perjured themselves in February 2008, which led to the plaintiffs being place on the Lewis List. *See* Compl. ¶¶ 31, 35; *see also* Pls.' Exs. 34–35.  The plaintiffs contend that AAG Collins's report against the plaintiffs was in retaliation for the unsuccessful prosecution in the Bridgewater case, caused in part by what the plaintiffs say was their truthful testimony. *See* Compl. ¶ 31.  Additionally, the plaintiffs allege

---

[11] The plaintiffs explain that call-back privileges "refers to the practice of calling an off-duty officer for criminal-related matters," and in particular "it refers to the policy of calling Plaintiffs during their days off regarding leads or urgent pursuit of a potential piece of evidence."  Pls.' D.C. Opp'n at 49 n.13.

that "the false accusation and ensuing investigation caused their working environment in the Department to grow even more hostile" and "DCFEMS management encouraged these false rumors and unfounded criticisms in an effort to isolate Plaintiffs and to damage their reputations." *Id.* As discussed above, the plaintiffs also had disciplinary charges brought against them in October 2008 after their participation in the K.A. case, which they say focused "on the disingenuous assertions that [the plaintiffs] had somehow violated K.A.'s rights," Pennington Decl. ¶ 93, and the plaintiffs claim that these charges were also retaliatory, *see* Compl. ¶ 41.

The plaintiffs further claim that they were retaliated against for their actions in the K.A. and Bridgewater cases when they were reassigned to the Community Service Unit ("CSU") on August 21, 2008. *See* Compl. ¶ 39. In the CSU, the plaintiffs' "duties consist of such menial tasks . . . as checking fire hydrants, installing batteries in smoke detectors, and passing out snacks to firefighters at fire scenes." *Id.* The plaintiffs allege that their transfer to the CSU was in retaliation for either testifying in the K.A. arson case or for filing complaints with the Equal Employment Opportunity Commission ("EEOC"), or both, *see* Pls.' D.C. Opp'n at 29–30, but the defendants maintain that the plaintiffs were transferred because the OAG had refused to rely upon or call the plaintiffs as witnesses and therefore they were unable to perform an "essential part of [their] job duties" as fire investigators, *see* Rubin Decl. ¶¶ 8–15.

After the plaintiffs were transferred to the CSU, they began speaking about their frustrations to people outside of the DCFEMs. In the days after they were transferred to the CSU, the plaintiffs allege that plaintiff Bowyer e-mailed then Mayor Adrian Fenty, City Administrator Dan Tangherlini, and City Council Chairman Vincent Gray, complaining about race discrimination within the FIU and specifically complaining that the plaintiffs had been retaliated against for filing EEOC complaints. *See* Compl. ¶ 40. The plaintiffs also gave

interviews to WJLA-TV, the local ABC News affiliate in the District, in which they accused the

DCFEMS of "demot[ing] them for exposing the Department's botched fire investigations."  *See*

*id.* ¶ 42.  WJLA originally aired the story on November 11, 2008 and aired a follow-up story on

November 26, 2008 that reported specifically on the plaintiffs' allegations that the DCFEMS was

assigning unqualified investigators to investigate fires in the District.  *Id.*  In addition to these

public communications, the plaintiffs also participated in investigatory interviews with the D.C.

Office of the Inspector General ("OIG") in January 2009, wherein they "set forth in detail their

allegations of botched fire investigations, racial discrimination, retaliation against

whistleblowers, and additional unlawful or improper conduct on the part of DCFEMS officials."

Pls.' D.C. Opp'n at 13; *see also* Pls.' Ex. 55, ECF No. 55-2 (memoranda of plaintiffs' interviews

with OIG).  After these communications were made, a new set of disciplinary charges was

brought against plaintiff Pennington on February 5, 2009, for allegedly misrepresenting himself

as a Certified Fire Investigator on a fire investigation record, *see* Pls.' Ex. 47, ECF No. 55-2, and

the plaintiffs also allege that a fellow firefighter was "assigned to CSU to monitor [the plaintiffs]

and report on their activities with the goal of developing negative information that can be used to

discipline . . . them or terminate their employment," Compl. ¶ 45; Bowyer Decl. ¶ 77;

Pennington Decl. ¶ 73.

   Following all of these events, the plaintiffs filed their three-count complaint in the instant

action on February 19, 2009.  First, the plaintiffs claim that, during the course of the events

described above, they made "protected disclosures" to their superiors within the DCFEMS,

prosecutors in the OAG and AUSA offices, the D.C. Council, and the media "concerning gross

mismanagement, gross misuse or waste of public resources or funds, abuse of authority in

connection with the administration of a public program, and violations of federal and local laws

and DCFEMS rules." Compl. ¶ 53. The plaintiffs allege that they were retaliated against by the District for making these "protected disclosures" in violation of the DCWPA. *Id.* ¶ 54.[12] The plaintiffs also allege two causes of action under 42 U.S.C. § 1983 for violations of their free speech rights under the First Amendment and their contractual rights under 42 U.S.C. § 1981. In their First Amendment claim, the plaintiffs contend that they spoke as citizens on matters of public concern (*e.g.*, mismanagement of fire investigations), and that "Defendants took retaliatory actions against Plaintiffs for their exercise of their First Amendment rights." *Id.* ¶¶ 68–71. In their § 1981 claim, the plaintiffs allege that the defendants "intentionally took adverse employment actions against Plaintiffs because of Plaintiffs' race and because of their opposition to racial discrimination . . ., which deprived Plaintiffs of their rights to contract on the same basis as white persons." *Id.* ¶ 59. After almost two years of discovery, including seven extensions of the discovery period, pending before the Court are motions for summary judgment by each of the defendants. For the reasons discussed below, the Court grants those motions.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Summary judgment is properly granted against a party who, "after adequate time for discovery and upon motion, . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The burden is on the moving party to demonstrate that there is an "absence of a genuine issue of material fact" in dispute. *Id.* at 323.

---

[12] The DCWPA claim was dismissed against the individual defendants. *See* Order dated Oct. 14, 2009 (Collyer, J.), ECF No. 10. This case was reassigned on January 19, 2011 to the current presiding Judge.

In ruling on a motion for summary judgment, the Court must draw all justifiable inferences in favor of the nonmoving party and shall accept the nonmoving party's evidence as true. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court is only required to consider the materials explicitly cited by the parties, but may on its own accord consider "other materials in the record." FED. R. CIV. P. 56(c)(3). For a factual dispute to be "genuine," the nonmoving party must establish more than "[t]he mere existence of a scintilla of evidence" in support of its position, *Liberty Lobby*, 477 U.S. at 252, and cannot rely on "mere allegations" or conclusory statements, *see Veitch v. England*, 471 F.3d 124, 134 (D.C. Cir. 2006); *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993); *accord* FED. R. CIV. P. 56(e). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *See, e.g.*, FED. R. CIV. P. 56(c)(1). If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50 (citations omitted).

"[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. In that situation, "[t]he moving party is 'entitled to judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.* Notably, "[s]elf-serving testimony does not create genuine issues of material fact, especially where that very testimony suggests that corroborating evidence should be readily available." *Fields v. Office of Johnson*, 520 F. Supp. 2d 101, 105 (D.D.C. 2007). Additionally, "on summary judgment, statements that are impermissible hearsay or that are not based on personal knowledge are precluded from consideration by the Court." *Riggsbee v. Diversity Servs., Inc.*, 637 F. Supp. 2d 39, 46 (D.D.C. 2009); *accord* FED. R. CIV. P. 56(c)(4)

("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."); *Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000) (holding that "[v]erdicts cannot rest on inadmissible evidence" and "sheer hearsay . . . therefore counts for nothing" at summary judgment).

"Evaluating whether evidence offered at summary judgment is sufficient to send a case to the jury," however, "is as much art as science."  *Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118, 123 (D.C. Cir. 2011).  Particularly in a case such as this where non-moving parties rely almost entirely upon their own uncorroborated statements in depositions, declarations, and interrogatory responses to create a genuine issue of material fact, the Court must carefully assess whether the plaintiffs' evidence is "merely colorable," *Liberty Lobby*, 477 U.S. at 249, or whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," *id.* at 248.  On the one hand, the Court must accept all of the non-movants' evidence as true and give them the benefit of all reasonable inferences.  *See id.* at 255.  On the other hand, a non-movant's allegations that are "generalized, conclusory and uncorroborated by any evidence other than the [non-movant's] own deposition testimony" are "insufficient to establish a triable issue of fact"—at least where the nature of the purported factual dispute reasonably suggests that corroborating evidence should be available.  *See Akridge v. Gallaudet Univ.*, 729 F. Supp. 2d 172, 183 (D.D.C. 2010); *see also Gen. Elec. Co. v. Jackson*, 595 F. Supp. 2d 8, 36 (D.D.C. 2009) (observing that when a "declaration is self-serving and uncorroborated" it is "of little value at the summary judgment stage").

## III.    DISCUSSION

As the discussion of the factual background above indicates, it is clear that the plaintiffs had during the time period in question, and perhaps continue to have, a tumultuous relationship with their colleagues and superiors.  The plaintiffs' frustration with the way the DCFEMS was managed and the way their superiors handled the plaintiffs' professional concerns is manifest in their myriad allegations.  Indeed, workplaces can be breeding grounds for hurt feelings, disagreements, and tension, and it is all the more unfortunate that a municipal fire department would fall prey to such dysfunction because its mission should remain focused on public safety, rather than being side-tracked with intra-workplace squabbles.  Nevertheless, there is a distinct separation—sometimes a sliver and sometimes a gulf—between workplace problems that present colorable legal claims and those that reflect the friction of strong disagreements.  As the discussion below makes plain, the factual record in this case is replete with significant gaps and omissions, which makes it difficult to discern on which side of that separation the plaintiffs' claims lay.  In the final calculus, however, the gaps and omissions in the summary judgment record are simply too pervasive to allow the plaintiffs' claims to move forward.

The plaintiffs make three claims for relief, each of which is predicated upon a theory of protected speech by the plaintiffs that was met with retaliatory conduct by the defendants.  The Court will first discuss the plaintiffs' claim under the D.C. Whistleblower Protection Act, which is brought only against the District, before assessing the plaintiff's two causes of action under 42 U.S.C. § 1983, which are brought against all three defendants.

### A.    Whistleblower Claim

The D.C. Whistleblower Protection Act ("DCWPA") is intended to ensure that "employees of the District government are free to report waste, fraud, abuse of authority,

violations of law, or threats to public health or safety without fear of retaliation or reprisal."

D.C. Code § 1-616.11 (1998).  Hence, at the time the plaintiffs' claims arose,[13] the DCWPA

provided that "[a] supervisor shall not threaten to take or take a prohibited personnel action or

otherwise retaliate against an employee because of the employee's protected disclosure."  *Id.* § 1-

616.13.  The Act defined (and continues to define) "prohibited personnel action" broadly as,

*inter alia*, "recommended, threatened, or actual termination, demotion, suspension, or reprimand;

involuntary transfer, reassignment, or detail; . . . or retaliating in any other manner against an

employee because that employee makes a protected disclosure."  *Id.* § 1-616.12(a)(5).  The Act

further defined a "protected disclosure" as:

> any disclosure of information, not specifically prohibited by statute, by an
> employee to a supervisor or a public body that the employee reasonably believes
> evidences:
>
> (A) Gross mismanagement;
>
> (B) Gross misuse or waste of public resources or funds;
>
> (C) Abuse of authority in connection with the administration of a public program
> or the execution of a public contract;
>
> (D) A violation of a federal, state, or local law, rule, or regulation . . . .; or
>
> (E) A substantial and specific danger to the public health and safety.

*Id.* § 1-616.12(a)(6).  Finally, the Act provided that:

> In a civil action . . . once it has been demonstrated by a preponderance of the
> evidence that an activity proscribed by [§ 1-616.13] was a contributing factor in
> the alleged prohibited personnel action against an employee, the burden of proof
> shall be on the employing District agency to prove by clear and convincing

---

[13] The DCWPA was amended in January 2010—several months after the plaintiffs filed their Complaint.  *See* Whistleblower Protection Amendment Act of 2009, 57 D.C. Reg. 896 (Jan. 22, 2010).  None of the substantive changes made in the 2009 amendments apply retroactively to the plaintiffs' claims because the amendments "attach[] new legal consequences to events completed before [their] enactment."  *Landgraf v. USI Film Prods.*, 511 U.S. 244, 270 (1994); *see also Bowyer v. District of Columbia*, 779 F. Supp. 2d 159, 163–64 (D.D.C. 2011) (applying elimination of pre-suit notice in DCWPA retroactively because it was procedural change).  It is for this reason that the Court will only refer to the 1998 version of the DCWPA that was in place until the 2010 amendments were enacted.

> evidence that the alleged action would have occurred for legitimate, independent
> reasons even if the employee had not engaged in activities protected by this
> section.

*Id.* § 1-616.14(b). A "contributing factor" means "any factor which, alone or in connection with

other factors, tends to affect in any way the outcome of the decision." *Id.* § 1-616.12(a)(2).

Hence, to make out a *prima facie* case under the DCWPA, a plaintiff must prove, by a

preponderance of the evidence, (1) a "protected disclosure"; (2) a "prohibited personnel action";

and (3) a causal connection between the protected disclosure and the prohibited personnel action,

such that the protected disclosure was at least a "contributing factor" in the personnel action.

*See, e.g.*, *Hawkins v. Boone*, 786 F. Supp. 2d 328, 333 (D.D.C. 2011); D.C. Code § 1-616.14(b)

(1998).

As the foregoing recitation of the factual background attests, the plaintiffs aver a laundry

list of various disclosures and complaints that they made within and outside the DCFEMS, and

they likewise cite a laundry list of actions by the District that they claim were retaliatory. The

critical task for the plaintiffs' DCWPA claim, however, is to locate disclosures that are protected

by the DCWPA and which also have a causal connection to a prohibited personal action taken by

the District. The plaintiffs simplify this exercise by focusing their arguments on four sets of

disclosures and personnel actions that they argue establish a *prima facie* case under the DCWPA.

*See* Pls.' D.C. Opp'n at 27–30.

### 1.    *Prohibited Personnel Actions*

The plaintiffs organize their DCWPA argument around four separate personnel actions

by the District:  (1) removing the plaintiffs from the Burned Vehicle Unit ("BVI"); (2) changing

the plaintiffs' schedule from a Monday–Friday daytime schedule to a 24-hour on-duty/72-hour

off-duty schedule; (3) taking away the plaintiffs' take-home car privileges and call-back

privileges and moving them to an office space that housed the K-9 unit; and (4) reassigning the plaintiffs to the Community Service Unit ("CSU").  *See id.*[14]

Although the parties have elected not to brief this issue, the second personnel action listed above (changing the plaintiffs' schedule) does not qualify as a "prohibited personnel action" under the DCWPA, and therefore it cannot serve as the basis for a *prima facie* case.  The DCWPA's definition of "prohibited personnel action," though broadly drawn, does not encompass a mere change in an employee's schedule that does not result in a material or tangible change in the employee's privileges, benefits, pay, or work assignments.  *See* D.C. Code § 1-616.12(a)(5) (1998).  The statute does not expressly contemplate schedule changes as "prohibited personnel actions," and thus a schedule change cannot be considered a prohibited personnel action unless it could be reasonably construed as a "demotion," "reprimand," "reassignment," or "transfer," *i.e.*, a materially adverse change in employment.  *Id.*; *see, e.g.*, *Williams v. District of Columbia*, 825 F. Supp. 2d 88, 98 (D.D.C. 2011) ("[A]n employee may recover under the DC-WPA only for those personnel actions that might well have dissuaded a reasonable employee in the plaintiff's position from making a protected disclosure.").

Courts have recognized that schedule changes can qualify as materially adverse personnel actions when the context of the schedule change exacts an identifiable cost on the employee, *see, e.g.*, *Caudle v. District of Columbia*, 804 F. Supp. 2d 32, 44 (D.D.C. 2011) (holding that "the

---

[14] The Complaint does not make an express claim of a hostile work environment, but the record does contain several oblique references to a "hostile work environment" within the FIU that was retaliatory.  *See, e.g.*, Compl. ¶¶ 22, 31, 42; *see also* Pls.' D.C. Opp'n at 4, 23, 47 n.12; Bowyer Decl. ¶ 17; Pennington Decl. ¶ 21; Pls.' Ex. 20, at 4, ECF No. 55-2; Pls.' Ex. 23, at 6, ECF No. 55-2.  To the extent the plaintiffs contend that they experienced a hostile work environment, that claim fails because the plaintiffs have not presented any evidence from which a reasonable jury could conclude that the plaintiffs were subjected to "'discriminatory intimidation, ridicule, and insult' that [was] 'sufficiently severe or pervasive to alter the conditions of the [plaintiffs'] employment and create an abusive working environment.'"  *Baird v. Gotbaum*, 662 F.3d 1246, 1250 (D.C. Cir. 2011) (quoting *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008)).  Although the record indicates that the plaintiffs' work environment was not ideal, and was at times unpleasant, the evidence they have presented does not meet "the demanding standards for a hostile work environment claim."  *Id.* (internal quotation marks omitted).

denial of a requested schedule change" was materially adverse because it "prevented [the plaintiff] from being at home with her school-age daughter"), or where the schedule change results in fewer hours, lower pay, or different job responsibilities, *see Than v. Radio Free Asia*, 496 F. Supp. 2d 38, 49 (D.D.C. 2007) ("[A] reasonable employee would consider that a reduction in work hours (and the resulting reduction in pay) . . . to be material adverse actions."); *Stone-Clark v. Blackhawk, Inc.*, 460 F. Supp. 2d 91, 97 (D.D.C. 2006) (schedule change was adverse where the change "dramatically reduced [plaintiff's] work hours and job responsibilities by removing her from the schedule completely").  The plaintiffs, however, have not demonstrated that the change from a Monday–Friday daytime schedule to a 24-hour on-duty/72-hour off-duty schedule, which they concede was applied across the DCFEMS, *see* Def. D.C.'s Reply in Supp. Mot. for Summ. J. ("D.C. Reply") at 13, ECF No. 59, would dissuade a reasonable employee from making a protected disclosure.  The plaintiffs argue that the scheduling change "made it significantly more difficult to conduct the investigations to which they were assigned," Pls.' D.C. Opp'n at 49, but they do not specify how their work was adversely impacted, much less present evidence to support such an adverse impact.  Although a 24 hours on-duty, 72 hours off-duty schedule might in some circumstances make investigating fires more difficult, the plaintiffs have failed to offer any evidence of whether that difficulty was merely minimal or whether, as they claim, it rose to the level of being materially adverse.  Since the plaintiffs have presented no evidence that their schedule change "might well have dissuaded a reasonable employee in the plaintiff's position from making a protected disclosure," *Williams*, 825 F. Supp. 2d at 98, the schedule change does not qualify as a "prohibited personnel action" under the DCWPA.

The other three personnel actions put forth by the plaintiffs, however, qualify as "prohibited personnel actions" under the DCWPA because they involve either "involuntary transfer[s]" or the removal of material employment privileges.  *See* D.C. Code. § 1-616.12(a)(5) (1998).  Therefore, the Court must next assess whether the plaintiffs have established any "protected disclosures" that could have been "contributing factors" to these prohibited personnel actions.

### 2.     *Protected Disclosures and Causal Connection*

The D.C. Court of Appeals has held that, in order for an employee's disclosure to be protected under the DCWPA, "'an employee must disclose such serious errors by the agency that a conclusion the agency erred is not debatable among reasonable people.'"  *Wilburn v. District of Columbia*, 957 A.2d 921, 925 (D.C. 2008) (quoting *White v. Dep't of the Air Force*, 391 F.3d 1377, 1382 (Fed. Cir. 2004)).[15]  Notably, the DCWPA does not require that an employee disclose actual gross mismanagement or misconduct.  Rather, a protected disclosure "is one that the employee 'reasonably believes' evidences one or more of the circumstances delineated in D.C. Code [§ 1-616.12(a)(6)(A)–(E) (1998)]."  *Id.*  The "proper test" for determining whether a belief is reasonable is to ask whether "a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the employee [could] reasonably conclude that the actions of the government evidence [illegality, gross mismanagement, etc.]."  *Zirkle v. District of Columbia*, 830 A.2d 1250, 1259–60 (D.C. 2003) (quoting *Lachance v. White*, 174 F.3d 1378, 1381 (Fed. Cir. 1999)).  In other words, "[a] purely subjective perspective of an employee is not sufficient even if shared by other employees" because the DCWPA "is not a weapon in

---

[15] The D.C. Court of Appeals "has recognized that the federal whistleblower statute, and its accompanying federal case law, are instructive in interpreting the DC-WPA."  *Williams v. District of Columbia*, 9 A.3d 484, 489 n.1 (D.C. 2010).

arguments over policy or a shield for insubordinate conduct." *Id.* (quoting *Lachance*, 174 F.3d at 1381).

a) *Disclosure of Cheating Allegations*

The plaintiffs first argue that their alleged disclosure "that [Sgt.] Proctor had abused his authority to help white firefighters cheat on the investigator's examination in early spring 2007" was a contributing factor in the decision to remove the plaintiffs from the BVI on March 26, 2007. *See* Pls.' D.C. Opp'n at 28. The plaintiffs correctly contend that "actively assisting white firefighters to help them pass the required exam," to the exclusion and detriment of African American firefighters, could reasonably be perceived as illegal behavior under Title VII and the D.C. Human Rights Act. *See id.* at 19. Even assuming that the plaintiffs are correct, however, the disclosure of these allegations by the plaintiff does not protect them because the record demonstrates that, if indeed the plaintiffs ever raised these allegations, the plaintiffs were not the ones who raised the allegations in the first instance. The defendants have presented an undisputed, sworn declaration by Sgt. Proctor, which states that cheating allegations were first raised by a different firefighter in an EEO complaint, not by the plaintiffs. *See* Decl. of Phillip Proctor ("Proctor Decl.") ¶¶ 10–11, ECF No. 59-3. It was this other firefighter's allegations that led to an investigation of Sgt. Proctor, *see id.* ¶ 16, and the plaintiffs only learned of these allegations after Sgt. Proctor told them, *id.* ¶¶ 14–15. Although the plaintiffs allege that they were the ones who raised the cheating allegations, they have presented no evidence to demonstrate that crucial fact, nor have they contested the substance of the Proctor Declaration, which contradicts the plaintiffs' unsupported assertions. Therefore, the cheating allegations against Sgt. Proctor do not qualify as a protected disclosure in the instant action because the plaintiffs were not the ones to raise those allegations in the first instance, and thus the proverbial whistle had already been blown before the plaintiffs ever learned of the cheating allegations. *See*

*Wilburn*, 957 A.2d at 925–26 (Pre-2010 version of DCWPA only protects disclosures of information "that was not already known" (citing *Meuwissen v. Dep't of the Interior*, 234 F.3d 9, 13 (Fed. Cir. 2000))).[16]

        *b)*     *Disclosure of Problems with the Bridgewater Case*

Next, the plaintiffs argue that their alleged disclosure to AUSA Matt Graves of purported problems with the Bridgewater fireworks investigation was a contributing factor in the decision to take away the plaintiffs' take-home car privileges and call-back privileges and to reassign them to an office space that housed the K-9 unit.  *See* Pls.' D.C. Opp'n at 29.  The plaintiffs say that they informed AUSA Graves that the "FIU had lost the seized fireworks and money, and that the photographs Graves had did not depict the scene properly," and they argue that a reasonable person would view this alleged loss of evidence in a criminal case as "blatant gross mismanagement."  *Id.* at 24.  The plaintiffs are correct that the apparent mishandling and loss of material evidence in a criminal case qualifies as "gross mismanagement" under the DCWPA. *See, e.g.*, *Mentzer v. Lanier*, 677 F. Supp. 2d 242, 250 (D.D.C. 2010) (interpreting "gross mismanagement" in DCWPA to mean "'a management action or inaction which creates a substantial risk of significant adverse impact upon the agency's ability to accomplish its mission'" (quoting *Kavanagh v. Merit Sys. Prot. Bd.*, 176 F. App'x 133, 135 (Fed. Cir. 2006))).

Yet, the plaintiffs offer no evidence (other than the characterizations in their self-serving and uncorroborated deposition testimony) to establish the nature of their disclosures to AUSA Graves.  *See* Pls.' D.C. Opp'n at 24–25, 29.  As the D.C. Court of Appeals has cautioned:

---

[16] The 2010 amendments to the DCWPA broadened the definition of "protected disclosure" to mean "any disclosure of information . . . without restriction to time, place, form, motive, context, forum, *or prior disclosure made to any person by an employee or applicant*."  *See* D.C. Code. § 1-615.52(a)(6) (2012) (emphasis added).  The D.C. Court of Appeals has observed that this new language "reflects the Council's focus on protecting employees or applicants who risk their job security to disclose information that might have already been disclosed by another employee or applicant."  *Williams*, 9 A.3d at 490 n.5.  This statutory change, however, does not apply retroactively to the plaintiffs' claims in the instant action, and therefore it cannot save the plaintiffs' claim with regard to the 2007 cheating allegations.  *See supra* note 13.

"'[T]he basis for determining the nature of . . . charges' that a putative whistleblower has made 'are the statements . . . in [his] complaint' to a supervisor or to a public body, 'not [his] subsequent characterization of those statements' in litigation." *Wilburn*, 957 A.2d at 925 (quoting *Ward v. Merit Sys. Prot. Bd.*, 981 F.2d 521, 523–28 (Fed. Cir. 1992)).  AAG Collins disputes that any evidence was lost or destroyed at all in the Bridgewater fireworks case, *see* Collins Decl. ¶ 41, and the plaintiffs offer no corroborating evidence—either from AUSA Graves or otherwise—regarding what was disclosed to him or why he chose to drop the case against Bridgewater.

What is more, plaintiff Pennington's sparse discussion of these disclosures in his own deposition testimony is inconsistent.  At one point, plaintiff Pennington asserted that he revealed several problems to AUSA Graves in their November 1, 2007 meeting. *See* Pls.' Ex. 4, at 147–48 (testifying that he discussed "the chain of custody, the fact that [AAG] Collins knew that the evidence was missing," and other purported problems with the investigation "when [he] was in Matt Graves' office talking about the Bridgewater case").  This is also what the plaintiffs contend in their briefing. *See* Pls.' D.C. Opp'n at 24.  At another point in his deposition, however, plaintiff Pennington implied that he did not reveal any issues to AUSA Graves until Pennington asked to recuse himself—the day *after* he met with Graves. *See* Pls.' Ex. 4, at 139 ("In the attorney/witness conference, I was reviewing the documents and evidence that we had . . . in preparation for the Bridgewater trial, and I—the next day, I requested to recuse myself based on what I saw was missing . . . .").  Plaintiff Pennington also makes no mention in his sworn declaration of disclosing missing evidence to AUSA Graves.  Rather, plaintiff Pennington only references telling AUSA Graves about "inconsistent representations about where the gun

was found" and "FIU members who were involved in the case that were under investigation."
Pennington Decl. ¶ 57.

In sum, the plaintiffs' evidence offered to establish the nature of the disclosures made is
murky and inconsistent at best.  This problem with the plaintiffs' evidence is exacerbated by the
fact that it is narrowly limited to the plaintiffs' self-serving deposition testimony and
uncorroborated by either documentary evidence or the testimony of others involved in the case
who should have at least been able to confirm the substance of what the plaintiffs disclosed, *e.g.*,
Sgt. Proctor, AAG Collins, and AUSA Graves.  In fact, these three individuals are either silent in
the record or directly contest the plaintiffs' version of events.  *See* Pls.' Ex. 69 ¶¶ 41–43, ECF
No. 55-2 (Sgt. Proctor stating in sworn declaration that "no evidence in the Bridgewater case was
missing" and that AUSA Graves informed him that plaintiff Pennington's "sole reason" cited for
recusal was "he felt that Investigator James Taylor had veracity issues"); Collins Decl. ¶¶ 21–22,
41 (testifying that "[AUSA] Graves told me that Pennington told him he was recusing himself
from the case based on his belief that Taylor should not be involved" and that "no evidence in
the Bridgewater matter was lost or destroyed").[17]  As a result of these deficiencies in the
plaintiffs' evidence, the plaintiffs have failed to establish that the disclosures they allege were
made regarding the Bridgewater fireworks case were "protected disclosures" under the DCWPA.

---

[17] Although the Court considers this testimony of Sgt. Proctor and AAG Collins insofar as their version of events
tends to impeach the plaintiffs' theory, the Court is mindful that their testimony is also hearsay insofar as it offers
the out-of-court statements of AUSA Graves for the truth of the matter asserted.  The Court does not consider such
hearsay evidence in deciding the defendants' summary judgment motions.  *See Gleklen*, 199 F.3d at 1369.
Regardless, such evidence is ultimately immaterial to the plaintiff's failure to establish that the disclosures they
allege were made regarding the Bridgewater fireworks case were "protected disclosures" under the DCWPA.  *See
Celotex*, 477 U.S. at 323 ("[A] complete failure of proof concerning an essential element of the nonmoving party's
case necessarily renders all other facts immaterial.").  The plaintiffs request that the Court strike the declarations of
AAGs Collins, Chesser, and O'Connor because they "are riddled with hearsay and statements that either lack
foundation or are otherwise made without personal knowledge."  Pls.' D.C. Opp'n at 14.  The Court reiterates that it
does not consider any hearsay evidence in deciding the defendants' motions, but the plaintiffs' request to strike these
three declarations in their entirety is denied because all three declarations contain a number of facts that are not
based on hearsay and that are relevant to deciding the defendants' motions.

c)       *Testimony in the K.A. Trial and EEOC Complaints*

Finally, the plaintiffs appear to argue that their EEOC complaints regarding racial

discrimination and their testimony in the K.A. arson trial were protected disclosures and were

also contributing factors in the decision to reassign the plaintiffs from the FIU to the CSU.  *See*

Pls.' D.C. Opp'n at 29–30.  Clearly, EEOC complaints containing reasonably colorable

allegations of racial discrimination are the quintessential example of protected activity and easily

fall within the DCWPA's definition of "violation[s] of a federal, state, or local law."  *See* D.C.

Code. § 1-616.12(a)(6)(D) (1998); *Smith v. District of Columbia*, 430 F.3d 450, 455 (D.C. Cir.

2005) ("Clearly, [the plaintiff] engaged in a statutorily-protected activity when she filed her first

EEOC complaint.").  The plaintiffs' argument regarding their testimony in the K.A. arson trial,

however, is less clear.  They argue that plaintiff Bowyer's "truthful testimony" in the K.A. trial,

which apparently included testimony "regarding the problems with the investigation, evidence,

and origin and cause determination," was a protected disclosure.  *See* Pls.' D.C. Opp'n at 25, 29–

30.  The plaintiffs characterize the problems with the K.A. investigation as "gross

mismanagement and abuse of authority" because the issues allegedly included contaminating

pieces of evidence, failing to secure the scene of the fire, and "us[ing] a DCFEMS Accelerant

Detection K-9 dog with a known record of inaccurate alerts to determine the cause of the fire."

*See id.* at 24–25.

There are three potential problems with finding that plaintiff Bowyer's K.A. trial

testimony qualifies as a "protected disclosure" under the DCWPA.  First and most importantly,

there is scant evidence regarding exactly what the plaintiffs disclosed to their superiors and what

plaintiff Bowyer testified to regarding "problems" or "holes" in the origin-and-cause

investigation.  Although the parties both appear to agree that plaintiff Bowyer's testimony was

not helpful to the prosecution—which seems fairly obvious from the fact that the defense

34

subpoenaed him to testify—testimony that is damaging to a criminal prosecution does not necessarily reveal "gross mismanagement."  The plaintiffs elaborate in their briefing about the alleged problems with the K.A. investigation, *see id.*, but this is simply the plaintiffs' characterization of the problems for purposes of litigation.  As the Court has already touched upon above, "'[t]he basis for determining the nature of . . . charges' that a putative whistleblower has made 'are the statements . . . in [his] complaint' to a supervisor or to a public body, 'not [his] subsequent characterization of those statements' in litigation."  *Wilburn*, 957 A.2d at 925 (quoting *Ward*, 981 F.2d at 523–28).  Thus, the fact that the plaintiffs rely solely upon plaintiff Bowyer's subsequent characterization of his testimony to establish its protected nature is problematic.

Additionally, even accepting as true the plaintiffs' *post hoc* characterization of plaintiff Bowyer's testimony, it is far from clear that the problems Bowyer identified with the K.A. investigation rise to the level of "gross mismanagement" under the DCWPA.  The plaintiffs argue that "a reasonable person could conclude that the blatant improper handling of the scene constituted evidence of gross mismanagement," Pls.' D.C. Opp'n at 25, but the alleged procedural shortcomings of investigator Kittrell's investigation could easily be viewed as simple professional negligence on the part of a relatively inexperienced investigator, *see Lopez v. Hous. & Urban Dev.*, No. 96-3230, 1996 WL 532742, at *1 (Fed. Cir. Sept. 19, 1996) ("Gross mismanagement must be more than mere inadvertence or negligence." (citing *Ward*, 981 F.2d at 525)).  Nevertheless, the Court is mindful that the "expansive protections" of the DCWPA are "designed to encourage disclosures concerning a broad universe of government misconduct and public safety issues."  *Saunders v. District of Columbia*, 789 F. Supp. 2d 48, 57 (D.D.C. 2011); *see also Mentzer*, 677 F. Supp. 2d at 250 (extending protection to disclosure of, *inter alia*,

negligent care of horses within the mounted police).  Therefore, the plaintiffs' characterization of plaintiff Bowyer's trial testimony may be sufficiently serious for a disinterested observer reasonably to conclude that the K.A. investigation involved gross mismanagement.

Returning to the first problem discussed above, however, the Court cannot merely rubber-stamp the plaintiffs' *post hoc* characterizations and relieve the plaintiffs of their burden to demonstrate that plaintiff Bowyer's trial testimony revealed gross mismanagement.  *See Wilburn*, 957 A.2d at 925.  Since the plaintiffs attempt to rely solely upon a subsequent, self-serving characterization of the testimony, rather than an objective account of the testimony itself, the Court concludes that the plaintiffs have failed to establish a *prima facie* case regarding the protected nature of plaintiff Bowyer's testimony in the K.A. trial.  Direct evidence of the substance of plaintiff Bowyer's testimony is critically important in determining whether it qualifies as a protected disclosure under the DCWPA.  *See id.* at 926 (observing that "[i]n none of her communications to the Council did [the plaintiff] describe [the law firm's] performance using the language of 'gross' waste or abuse, or of 'violation[s],'" and holding that the plaintiff's "choice of language belies her claim that she intended to convey . . . wrongdoing or abuse").  What is more, such evidence would be readily available in the form of a trial transcript.[18]  Yet, the plaintiffs have not offered so much as an excerpt from the K.A. trial transcript to support their argument at the summary judgment stage.  Therefore, the plaintiffs have failed to establish that plaintiff Bowyer's trial testimony in the K.A. arson case qualifies as a "protected disclosure" under the DCWPA, and thus cannot establish a *prima facie* case.

Third and finally, the plaintiffs claim that plaintiff Bowyer disclosed the same problems with the K.A. case to defendant Palmer and AAG Chesser on June 25, 2008—a month and a half

---

[18] The record indicates that a transcript of the trial was taken.  *See* Defs.' Ex. R, ECF No. 49-2.

before the trial testimony occurred.  *See* Pls.' D.C. Opp'n at 25.  Therefore, an additional reason

for concluding that the trial testimony was not protected is that plaintiff Bowyer "had already

acted to remedy the problem" by reporting it to his DCFEMS and OAG superiors well before he

allegedly "disclosed" the problems at trial.  *Wilburn*, 957 A.2d at 927.  Thus, plaintiff Bowyer's

statements at trial "did not constitute statements 'to persons who may be in a position to act to

remedy' the 'wrongdoing' disclosed."  *Id.* (quoting *Huffman v. Office of Pers. Mgmt.*, 263 F.3d

1341, 1349 (Fed. Cir. 2001)).

Nevertheless, as discussed above, plaintiff Bowyer's EEOC complaint, which is dated

"8/7/08," qualifies as a protected disclosure.[19]  *See* Pls.' Ex. 41, ECF No. 55-2.  With regard to

this complaint, the plaintiffs argue that the close temporal proximity between the filing of the

complaint and the plaintiffs' reassignment to the CSU raise "a strong inference of

connectedness."  Pls.' D.C. Opp'n at 30.  There are, however, at least two major problems in

relying on plaintiff Bowyer's EEOC complaint to conclude that it was a contributing factor in the

decision to reassign the plaintiffs.  First, although "[t]emporal proximity between a protected

activity and an adverse action can establish a prima facie case of retaliation if the employer had

knowledge of the protected activity," *Mentzer*, 677 F. Supp. 2d at 255 (citing *Clark Cnty. Sch.

Dist. v. Breeden*, 532 U.S. 268, 273 (2001)), the plaintiffs have presented no evidence that

anyone responsible for the reassignment knew about the EEOC complaint before the

reassignment occurred.

Additionally, although plaintiff Bowyer's signature on his EEOC complaint appears to be

dated August 7, 2008, and the plaintiffs state in their briefing that the complaint was filed on

August 13, 2008, *see* Pls.' Mem. of P. & A. in Opp'n to Def. Rubin's Mot. Summ. J. ("Pls.'

---

[19] Plaintiff Pennington also submitted an EEOC complaint, but it is dated August 22, 2008—the day *after* the plaintiffs were reassigned to the CSU—and therefore it could not have been a contributing factor in the reassignment.  *See* Pls.' Ex. 42, ECF No. 55-2.

Rubin Opp'n") at 20, ECF No. 57, the text of the EEOC charge clearly complains about alleged discrimination that occurred through September 1, 2008 (including the reassignment to the CSU).  *See* Pls.' Ex. 41.  This is strong evidence that the complaint was not completed until at least September 1, 2008, no matter when the date on the document suggests that it was signed. Indeed, it appears as though the complaint was not time-stamped by the EEOC Washington Field Office until the morning of September 8, 2008.  *See id.*  As a result, it would be impossible for any reasonable juror to conclude that plaintiff Bowyer's EEOC complaint contributed to the decision to reassign the plaintiffs on August 21, 2008 because it was not completed until September 1, 2008, at the earliest.

As a result of the foregoing analysis, the plaintiffs cannot establish a causal connection between any protected disclosures and the decision to reassign them to the CSU.  In the bigger picture, this also means that the plaintiffs are unable to establish a *prima facie* case of retaliation with respect to any combination of protected disclosures and prohibited personnel actions. Hence, the District is entitled to summary judgment on the plaintiffs' claim under the DCWPA.

### B.      Claim for Violation of First Amendment Rights

The plaintiffs' claim under 42 U.S.C. § 1983 that the defendants retaliated against them for exercising their First Amendment right to free speech is conceptually analogous to the plaintiffs' claim under the DCWPA.  Both claims assert that the plaintiffs engaged in certain protected speech and were retaliated against for doing so.  Despite this high-level similarity, however, the two claims must be analyzed under separate legal standards, even though the Court reaches the same conclusion as to both claims.

### 1.     *Requisite Showing for Claim of Retaliation for Exercise of First Amendment Rights*

"The speech of public employees enjoys considerable, but not unlimited, First Amendment protection." *Wilburn v. Robinson*, 480 F.3d 1140, 1149 (D.C. Cir. 2007).  Public employees seeking to make out a claim for retaliation in violation of their First Amendment rights must satisfy four elements:  (1) the public employees must have "spoken as citizens on a matter of public concern;" (2) the employees' interest, as citizens, "in commenting upon matters of public concern," must outweigh the governmental interest in "promoting the efficiency of the public services it performs through its employees;" (3) the employees must demonstrate that their "speech was a substantial or motivating factor in prompting the retaliatory or punitive act;" and (4) "the employee[s] must refute the government employer's showing, if made, that it would have reached the same decision in the absence of the protected speech." *Id.* (internal quotation marks omitted).  "The first two factors . . . are questions of law for the court to resolve, while the latter are questions of fact ordinarily for the jury." *Tao v. Freeh*, 27 F.3d 635, 639 (D.C. Cir. 1994).  The Supreme Court has provided guidance to courts in applying the first two factors.

At the outset, "a citizen who accepts public employment 'must accept certain limitations on his or her freedom.'" *Borough of Duryea v. Guarnieri*, 131 S. Ct. 2488, 2494 (2011) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)).  In order for a public employee's speech to be insulated from employer discipline, the employee must have been speaking "as a citizen upon matters of public concern." *Connick v. Myers*, 461 U.S. 138, 147 (1983).  The Supreme Court has clarified what it means for a public employee to speak as a citizen, holding that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421.  The rule articulated in

*Garcetti* has two components:  (1) whether the speech was made "pursuant to employment responsibilities" or "as a citizen," and (2) whether the speech was about "a matter of public concern" or a "matter[] only of personal interest."  *See id.* at 423–24; *Connick*, 461 U.S. at 147. "Whether an employee's speech is one of public concern depends on its content, form, and context, as revealed by the whole record."  *Tao*, 27 F.3d at 639 (citing *Connick*, 461 U.S. at 147–48).  "While an individual personnel dispute does not generally constitute a matter of public concern, an employee's speech aimed at resolving a personnel dispute may touch upon an issue of public concern."  *Id.* (citations omitted).

### 2. *Plaintiffs' Alleged Protected Speech*

The plaintiffs specifically cite four examples of speech in their briefing that they argue were protected under the First Amendment.  These four statements include:  (1) "report[ing] to Proctor, Lee, and Defendant Palmer that [Lt.] Duck was manipulating and miscalculating fire investigation data and reports in order to get newer or fancier equipment," (2) "report[ing] [that] their supervisor, Defendant Palmer, abused his authority to allow white firefighter candidates to cheat on the firefighter entrance exam,"[20] (3) speaking "with then-Mayor Adrian Fenty, then-City Administrator Dan Tangherlini, and then-Council Chairman Vincent Gray about race discrimination and retaliation at DCFEMS," and (4) making "statements on television and radio programs regarding retaliation, mishandling of evidence, and mismanagement of fire investigations with WJLA-TV, City Paper, and the Washington Post."  D.C. Opp'n at 42–43; *see also* Pls.' Rubin Opp'n at 30–32; Pls.' Mem. of P. & A. in Opp'n to Def. Palmer's Mot. Summ. J. ("Pls.' Palmer Opp'n") at 28–30, ECF No. 56.

---

[20] This is the only specific example provided for the more general category of speech offered by the plaintiffs, which allegedly consisted of "complain[ing] to supervisors, including Proctor, Lee, Defendant Palmer, and Defendant Rubin, about the racial discrimination within the FIU."  Pls.' D.C. Opp'n at 42.  As discussed *infra*, the plaintiffs' allegations that they disclosed and complained about racial discrimination in the FIU, with certain exceptions, are without any evidentiary basis.

The plaintiffs, however, do not even allege that two of these four statements were the motivation for particular personnel actions. Indeed, unlike the plaintiffs' DCWPA claim, the plaintiffs have not focused the analysis of their First Amendment claim around specific statements that are tied to specific personnel actions.[21] Since the plaintiffs do not claim that two of the four examples of allegedly protected speech have a nexus to an adverse employment action by the defendants, the Court will not discuss whether those two examples proffered by the plaintiff enjoy First Amendment protection.[22] The two exceptions, which the plaintiffs do attempt to connect to adverse employment actions, are the disclosure by the plaintiffs that Lt. Duck "was manipulating and miscalculating fire investigation data and reports" (1 above) and the disclosure of cheating on the firefighter exam (2 above). The plaintiffs clearly argue that the disclosure about Lt. Duck was the motivation behind the decision to change the plaintiffs' schedule, *see, e.g.*, Pls.' D.C. Opp'n at 28, and the plaintiffs also argue that the disclosure about cheating on the firefighter exam was the motivation behind the plaintiff's removal from the Burned Vehicle Initiative, *see id.*

### a) Disclosures About Lt. Duck and Sgt. Proctor

The Court will begin by analyzing the plaintiffs' alleged statements to supervisors about Lt. Duck manipulating fire data and reports (1 above). Since the plaintiffs allege that the retaliation for those statements was a schedule change, the Court must revisit the issue of whether the change in the plaintiffs' schedule from a Monday–Friday daytime schedule to a 24-

---

[21] The plaintiffs do, however, appear to anchor their First Amendment retaliation claim to the same four personnel actions cited in their DCWPA claim: (1) removing the plaintiffs from the Burned Vehicle Unit ("BVI"); (2) changing the plaintiffs' schedule from a Monday–Friday daytime schedule to a 24-hour on-duty/72-hour off-duty schedule; (3) taking away the plaintiffs' take-home car privileges and call-back privileges and moving them to an office space that housed the K-9 unit; and (4) reassigning the plaintiffs to the Community Service Unit ("CSU"). *See* Pls.' D.C. Opp'n at 47–50; *see also* Pls.' Palmer Opp'n at 33–37; Pls.' Rubin Opp'n at 35–38.

[22] Indeed, examples (3) and (4) above of allegedly protected speech—speaking with D.C. city officials and to the press—occurred *after* any of the adverse personnel actions identified by the plaintiffs, a timing conundrum that effectively undercuts any retaliation claim based on that speech. *See* Pls.' Ex. 62, ECF No. 55-2 (letters to D.C. City Council dated December 23, 2008, February 18, 2009, March 20, 2009, and April 3, 2009).

hour on-duty/72-hour off-duty schedule is sufficient to support the plaintiffs' First Amendment

claim.  Though the D.C. Circuit has held that "[e]mployer action taken against an employee in

response to her exercise of free speech need not be as significant as the denial of a promotion to

raise a constitutional claim," *Tao*, 27 F.3d at 639, whether an employer's alleged retaliation is

actionable "depends on whether the harassment is '[]likely to deter a person of ordinary firmness

from [the] exercise [of his First Amendment rights],'" *Toolasprashad v. Bureau of Prisons*, 286

F.3d 576, 585 (D.C. Cir. 2002) (quoting *Crawford-El v. Britton*, 93 F.3d 813, 826 (D.C. Cir.

1996), *vacated on other grounds*, 523 U.S. 574 (1998)).  This standard is very similar (if not

identical) to the standard articulated in *Burlington Northern* and discussed above.  *See supra* Part

III.A.1 (discussing whether personnel action "might well have dissuaded a reasonable employee

in the plaintiff's position from making a protected disclosure").  Thus, for the same reasons

discussed previously, the change to the plaintiffs' schedule is not sufficient to support the

plaintiffs' First Amendment claim.

     Next, the Court will discuss whether the First Amendment protects any of the plaintiffs'

other statements.  The Court will begin by discussing the second of the statements discussed

above that the plaintiffs specifically argue is both protected by the First Amendment and was

connected to an adverse personnel action:  the plaintiffs' complaint to their superiors that Sgt.

Proctor had helped certain white firefighters cheat on a fire instructor examination.  *See, e.g.*,

Pls.' D.C. Opp'n at 42.  There is little doubt that a statement about helping white firefighters

cheat, to the exclusion and detriment of African American firefighters, would be one of public

concern because it would raise the prospect of racial discrimination within the FIU.  As the D.C.

Circuit has held, "[a] statement concerning racial discrimination on the part of a public agency is

a matter of public concern because it involves information that enables members of society to

make informed decisions about the operation of their government." *Tao*, 27 F.3d at 640 (internal

quotation marks omitted).

The defendants argue, however, that evaluation of whether this speech would be

protected is unnecessary because the plaintiffs have failed even to put forth minimally sufficient

evidence to demonstrate that they spoke about Sgt. Proctor's alleged cheating at all. *See* Def.

Rubin's Reply to Pls.' Mem. of P. & A. in Opp'n to Def.'s Mot. Summ J. ("Rubin Reply") at 15,

ECF No. 61. Indeed, the only evidence cited by the plaintiffs to support the claim that they

raised allegations of cheating by Sgt. Proctor is a short snippet of plaintiff Pennington's

deposition. *See* Pls.' Ex. 4, at 42, 57. These two disjointed pages of plaintiff Pennington's

deposition state only that Pennington asked firefighters who had been detailed to the class

associated with the controversial exam about whether they would be interviewed in connection

with the "cheating scandal," *see id.* at 42 (stating that firefighters told Pennington that they "were

informed that they would be interviewed by the Inspector General's office over the cheating

scandal"), and that Pennington discussed race-related issues with Sgt. Proctor "after the cheating

scandal," *see id.* at 57 (testifying that Sgt. Proctor "told me that he was armed with the task of

bringing in more whites and women into the unit," in conversation that took place "[a]fter the

scuttlebutt was already around about the alleged cheating scandal"). The defendants are correct

that this evidence does not even minimally establish that either of the plaintiffs engaged in

protected speech about the alleged "cheating scandal" involving Sgt. Proctor because it amounts

to no evidence at all.[23] Hence, the plaintiffs have failed to meet the first element of their First

Amendment claim as it relates to the alleged protected speech regarding the purported "cheating

---

[23] Even if it were evidence of protected speech, it certainly would not provide any evidence that any of the DCFEMS officials responsible for the resulting personnel action (removing the plaintiffs from the BVI) had any knowledge of the purported speech.

scandal." *See, e.g.*, *Veitch*, 471 F.3d at 134 (non-moving party cannot rely on "mere allegations" to defeat a motion for summary judgment).

> b)   *Other Disclosures by Plaintiffs Not Protected by the First Amendment*

Finally, the Court will discuss two other instances of speech that the plaintiffs do not specifically argue were protected by the First Amendment, but which they do argue were connected to adverse employment actions:  (1) the plaintiffs' alleged disclosure of problems with the Bridgewater fireworks investigation, and (2) the plaintiffs' alleged disclosure of problems with the K.A. arson investigation.

Beginning with the Bridgewater fireworks case, as the Court observed in its discussion of these alleged disclosures in the context of the plaintiffs' DCWPA claim, the plaintiffs' evidence about what they said regarding the Bridgewater investigation is murky and inconsistent.  *See supra* Part III.A.2(b).  As a result, it is once again questionable whether and how the plaintiffs spoke about the Bridgewater investigation at all.  Assuming *arguendo* that the plaintiffs did speak about supposed deficiencies in the Bridgewater investigation, the Court concludes that the plaintiffs did so pursuant to their employment responsibilities, and not as citizens.  *See Garcetti*, 547 U.S. at 421.  Evaluating fire investigations like the one in the Bridgewater case was undoubtedly a part of the plaintiffs' job responsibilities as fire investigators, and the plaintiffs claim that they spoke about deficiencies in the Bridgewater fireworks investigation in their capacities as witnesses for the government—a responsibility that falls squarely within the job of investigating criminal activity.  *See* Pls.' D.C. Opp'n at 24 (stating that plaintiff Bowyer revealed problems with the investigation to AUSA Graves at a meeting "to prepare the case against Timothy Bridgewater").  Under these circumstances, "the First Amendment does not 'shield[] from discipline the expressions' [the plaintiffs] made." *Robinson*, 480 F.3d at 1151 (quoting

*Garcetti*, 547 U.S. at 426); *cf. Huppert v. City of Pittsburg*, 574 F.3d 696, 707–08 (9th Cir. 2009) (holding that police officer's testimony to grand jury was not protected by First Amendment because "California expects such testimony from its police officers").

It is less clear whether the First Amendment protects plaintiff Bowyer's trial testimony in the K.A. arson case, which is the final example of potentially protected speech that the plaintiffs claim led to an adverse and retaliatory action. *See, e.g.*, Pls.' D.C. Opp'n at 29–30. Unlike in the Bridgewater fireworks case, plaintiff Bowyer testified in the K.A. arson trial for the defense "as an expert with regards to general fire origin and cause and not with specifics to the case." Pls.' D.C. Facts ¶ 56; *accord* Def.'s Response to Pls.' Statement of Disputed Facts ("D.C. Reply Facts") ¶ 56, ECF No. 59-1. There is no evidence to suggest that plaintiff Bowyer's employment responsibilities included testimony for a defendant when Bowyer was subpoenaed to do so. At the same time, the D.C. Circuit has observed that, even where a government employee's supervisors does not want the employee to speak about a certain topic, and even though that speech "might otherwise be just the sort of citizen speech protected by the First Amendment, the uncommonly close relationship between [a public employee's] duties and his advocacy before [a public body] precludes protection." *Windsor v. Erste*, 566 F.3d 209, 215 (D.C. Cir. 2009). In the instant case, however, no such "uncommonly close relationship" is apparent because plaintiff Bowyer was purportedly called to testify as an expert witness, not as a fact witness regarding his professional involvement in the arson investigation. *See* Pls.' D.C. Facts ¶ 56; D.C. Reply Facts ¶ 56. Furthermore, the D.C. Circuit has suggested in dictum that testimony subpoenaed by a third party, which plaintiff Bowyer's testimony was in the K.A. trial, is generally considered outside of a public employee's official duties. *See Bowie v. Maddox*, 653 F.3d 45, 46 n.1 (D.C. Cir. 2011); *accord Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1105–06 (9th Cir. 2011)

(holding that public employee's subpoenaed testimony was as a private citizen); *Morales v. Jones*, 494 F.3d 590, 598 (7th Cir. 2007) ("Being deposed in a civil suit pursuant to a subpoena was unquestionably not one of [the plaintiff's] job duties because it was not part of what he was employed to do.").  Therefore, it is reasonable to conclude that plaintiff Bowyer's testimony in the K.A. trial was as a private citizen.

As discussed previously, whether or not plaintiff Bowyer's testimony was on a matter of public concern remains factually unclear due to the lack of evidence in the record regarding the content of Bowyer's testimony.  The plaintiffs claim that Bowyer "responded truthfully to questions by the defense regarding the problems with the investigation, evidence, and origin and cause determination," which allegedly included the contamination of evidence and failing to properly rope off the scene, *see* Pls.' D.C. Opp'n at 24–25 (citing Pls.' Ex. 51, ECF No. 55-2),[24] though the plaintiffs have not submitted any portions of the transcript from Bowyer's testimony. In light of the paramount importance of adjudicating a defendant's guilt or innocence, however, the Court concludes that all testimony given in a criminal trial necessarily falls within the arena of public concern.  Therefore, although the content of plaintiff Bowyer's trial testimony is unclear, the context of the speech alone is sufficient to allow the Court to conclude that the testimony was on a matter of public concern.  *See, e.g.*, *Green v. Phila. Hous. Auth.*, 105 F.3d 882, 887 (3d Cir. 1997) ("[T]he context of a courtroom appearance raises speech to a level of public concern, regardless of its content." (citing *Pro v. Donatucci*, 81 F.3d 1283, 1291 (3d Cir. 1996)).[25]

---

[24] Plaintiffs' Exhibit 51 is merely a copy of the subpoena directed to Bowyer, and it does not include any description or summary of his testimony.

[25] In so holding, the Court acknowledges that "other circuits are divided over whether the context of a courtroom appearance raises a public employee witness's testimony to the level of public concern, regardless of its content." *Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 926 n.6 (9th Cir. 2004) (collecting cases).  The Third and Fifth Circuits squarely hold that "the context of a courtroom appearance raises speech to a level of public concern,

Nevertheless, the plaintiffs have failed to "refute the [defendants'] showing . . . that [they] would have reached the same decision in the absence of the protected speech." *Robinson*, 480 F.3d at 1149.  Although this is a "question[] of fact ordinarily for the jury," *Tao*, 27 F.3d at 639, a complete absence of evidence on this element would entitle the defendants to summary judgment.  *See Celotex*, 477 U.S. at 323 ("[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").  As discussed above, the relevant "decision" that the plaintiffs allege was in retaliation for plaintiff Bowyer's testimony in the K.A. trial was the decision to reassign the plaintiffs to the CSU.  *See* Pls.' D.C. Opp'n at 50.  The defendants contend that the plaintiffs were reassigned to the CSU "to afford the Department an opportunity to investigate concerns raised by the OAG, and in particular, those raised by Deputy Attorney General Robert Hildum."  Def. D.C.'s Mem. of P. & A. in Supp. of Its Mot. Summ. J. ("D.C. Mem.") at 26, ECF No. 49.  In his sworn declaration and deposition testimony, defendant Rubin stated that he met with Hildum on August 21, 2008, the same day of the reassignment decision.  *See* Rubin Decl. ¶ 3.  In this meeting, Hildum informed defendant Rubin about the OAG's concerns that, *inter alia*, plaintiff Bowyer had perjured himself in the Bridgewater case, the plaintiffs had improperly provided information to defense counsel without permission in cases prosecuted by the OAG, and the plaintiffs had failed to read

---

regardless of its content." *Green*, 105 F.3d at 887 (citing *Pro*, 81 F.3d at 1291); *see also Johnston v. Harris Cnty. Flood Control Dist.*, 869 F.2d 1565, 1578 (5th Cir. 1989) ("When an employee testifies before an official government adjudicatory or fact-finding body he speaks in a context that is inherently of public concern.").  Other Circuits, however, have refused to adopt such a categorical rule.  *See Padilla v. S. Harrison R-II Sch. Dist.*, 181 F.3d 992, 996–97 (8th Cir. 1999) (holding that teacher's "compelled testimony" about "the propriety of a sexual relationship between a teacher and a nonstudent minor" did not relate to a matter of public concern); *Wright v. Ill. Dep't of Children & Family Servs.*, 40 F.3d 1492, 1505 (7th Cir. 1994) ("[O]ur cases have rejected a blanket rule according absolute First Amendment protection to communications made in the course of a lawsuit" because "airing private gripes in the form of a complaint or testimony cannot alter their status as private gripes"); *Arvinger v. Mayor & City Council of Balt.*, 862 F.2d 75, 78–79 (4th Cir. 1988) (holding that government employees testimony at coworker's fair employment hearing was not on a matter of public concern because it "was made solely to further the interests of [the plaintiff and his coworker]" and not "to further the public debate on employment discrimination, drug policy, or any other topic").  Complicating matters further, the D.C. Circuit has yet to address this particular question.

*Miranda* rights to the suspect in the K.A. arson case. *See id.* ¶¶ 8–12; Defs.' Ex. I at 63:1–64:16,

ECF No. 48-2 (testifying that Hildum described, *inter alia,* "perjury, described inefficiency in

effectiveness, lack of cooperation, described hiding, concealing, confusing evidence"). Hildum

also informed defendant Rubin that the OAG had placed the plaintiffs on the Lewis List, and

"they would no longer be allowed to testify on behalf of the District in the prosecution of

criminal cases." Rubin Decl. ¶ 13. Since "[w]orking with OAG prosecutors was the essential

part of [the] job duties of Pennington and Bowyer," defendant Rubin "decided they should be

detailed out of the [FIU]." *Id.* ¶¶ 14–15.

The plaintiffs offer no evidence to rebut the defendants' showing, though they do offer

two arguments. First, the plaintiffs argue that "[t]he investigation into Plaintiffs' testimony,

based on complaints by Deputy Attorney General Hildum, [which] stemmed directly from their

truthful disclosures in court, was in itself a retaliatory action and therefore cannot be a legitimate,

independent justification for Plaintiffs' transfer." Pls.' D.C. Opp'n at 50. This is wrong for two

reasons. First, calling the plaintiffs' testimony "truthful disclosures in court" begs the question

because the purpose of the investigation was to determine just that: the truth or falsity of the

testimony. *See* Defs.' Ex. I at 68:3–16 (describing how plaintiffs were "innocent until proven

guilty" and were reassigned "in the interim . . . to take them out of the pathway of not being able

to write reports, not being able to testify, not being able to conduct investigations or

inspections"). More importantly, the investigation itself could not have been "retaliatory," as the

plaintiffs argue, because it was triggered by someone outside of the DCFEMS: Deputy Attorney

General Hildum, who informed defendant Rubin that the plaintiffs "would not be allowed to

participate in any court proceedings, [and] would not ever be called on again as a city witness"

because "[t]hey lacked veracity, in his opinion." *Id.* at 64:10–13. These concerns were later

memorialized in letters to defendant Rubin on October 27–28, 2008.  *See* Defs.' Reply Exs. B–C, ECF No. 59-3.

Second, the plaintiffs argue that the District cannot show that it would have taken the same actions because "[t]he District treated Plaintiffs less favorably than other FIU personnel who were under investigation."  Pls.' D.C. Opp'n at 50–51.  The only specific example the plaintiffs offer is that of a white investigator, James Taylor, who the plaintiffs say "was sent to training in New Mexico while awaiting a conclusion of the investigation into allegations of his criminal, civil, and administrative violations."  *Id.* at 51.  First and foremost, the plaintiffs offer no evidence to support this assertion other than their own conclusory statements.  *See id.* (citing Pls.' Ex. 23, a memorandum written by plaintiff Bowyer to Assistant Fire Chief Alfred Jeffrey, making same allegations without support).  Furthermore, the assertion itself would be insufficient to rebut the defendants' showing because the plaintiffs do not specify what "criminal, civil, and administrative violations" were being investigated and whether they were similar to the allegations against the plaintiffs.  A separate portion of the record indicates that Investigator Taylor "had been held in contempt in a domestic relations matter," *see* Collins Decl. ¶ 17; *see also* Pennington Decl. ¶ 57 (referencing "James Taylor being found guilty of contempt and awaiting sentencing"), but the plaintiffs do not say whether this is what they mean when they refer to "criminal, civil, and administrative violations" on the part of Investigator Taylor.

Treating similarly situated employees differently would, if supported, rebut the defendants' showing that they would have reassigned the plaintiffs absent the protected activity. *See Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008) (plaintiff may demonstrate pretext by "produc[ing] evidence suggesting that the employer treated other employees . . . more favorably in the same factual circumstances").  The plaintiffs, however,

have produced no evidence to demonstrate that Investigator Taylor was treated differently or that he was similarly situated to the plaintiffs.  First, the plaintiffs' purported evidence indicates that Investigator Taylor "was removed from the unit while under investigation," just as the plaintiffs were, which suggests that Investigator Taylor was not actually treated differently.  *See* Pls.' Ex. 23, at 6.  Furthermore, the plaintiffs' alleged conduct, *i.e.*, perjuring themselves while testifying pursuant to their official duties, would be substantially different, and much more serious, than a firefighter held in contempt in a domestic relations matter that is unconnected to his professional duties.  Such a factual distinction would logically warrant differing treatment by the DCFEMs. Therefore, the plaintiffs have not rebutted the defendants' showing that they would have taken the same actions absent the plaintiffs' protected activity, and thus the plaintiffs have failed to produce evidence to establish an essential element of their First Amendment claim.

As a result of the foregoing analysis, the plaintiffs have failed to submit sufficient evidence to establish at least one essential element of their First Amendment claim because they have either failed to put forth statements that were made "as a citizen upon matters of public concern," *Connick*, 461 U.S. at 147, or they have failed to "refute the [defendants'] showing . . . that [they] would have reached the same decision in the absence of the protected speech." *Robinson*, 480 F.3d at 1149.[26]  Therefore, the defendants are entitled to summary judgment on the plaintiffs' First Amendment claim.

---

[26] Also, for the reasons discussed in relation to the plaintiffs' DCWPA claim, plaintiff Bowyer's EEOC complaint cannot serve as the basis for a retaliation claim insofar as the claimed retaliation was the reassignment of the plaintiffs to the CSU.  *See supra* Part III.A.2(c).  Despite the fact that plaintiff Bowyer's EEOC complaint likely enjoys First Amendment protection, the record indicates that it was not completed until *after* the reassignment to the CSU took place and thus, logically, could not have been the trigger for, or even affected, the decision to reassign the plaintiffs to the CSU.  *See id.*

C.      **Claim for Violation of Right to Contract**

The plaintiffs' final claim, brought pursuant to 42 U.S.C. § 1983, is that the defendants "deprived Plaintiffs of their right to contract on the same basis as white persons in violation of 42 U.S.C. § 1981." Compl. ¶ 59. The nub of this claim, like the plaintiffs' first two claims, is that the defendants retaliated against the plaintiffs for engaging in protected activity. The plaintiffs allege that their protected activity was "opposing race discrimination in the Department, by reporting it internally and filing charges with the EEOC and the [D.C. Office of Human Rights, or DCOHR]." *Id.* ¶ 60. Furthermore, the plaintiffs appear to argue that the defendants retaliated against them by "institut[ing] a discriminatory policy" that gave preferential treatment to white firefighters in the FIU. *See* Pls.' Rubin Opp'n at 18 ("Defendant instituted a discriminatory policy pursuant to which the adverse actions against Plaintiffs were taken."); Pls.' D.C. Opp'n at 35–36 (citing "a race-based policy adopted by Defendant Rubin aimed at increasing the number of white investigators in the [FIU]" as the mechanism through which their contract rights were deprived).

The Supreme Court has clearly held that "42 U.S.C. § 1981 encompasses claims of retaliation." *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 457 (2008). The plaintiffs' cause of action, however, is not brought under 42 U.S.C. § 1981 directly. Rather, the plaintiffs' cause of action is brought under 42 U.S.C. § 1983, which provides a legal remedy for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" that is perpetrated "under color of [state or District of Columbia law]." *See* 42 U.S.C. § 1983. The plaintiffs' theory is that the allegedly adverse employment actions taken against them in retaliation for their allegedly protected activities "deprived them of their rights to contract in violation of 42 U.S.C. § 1981" and "were taken under color of law within the meaning of 42 U.S.C. § 1983." Pls.' D.C.

Opp'n at 32 (internal quotation marks omitted).  Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens."  42 U.S.C. § 1981(a).  The statute further provides that "the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  *Id.* § 1981(b).

The plaintiffs were precluded by the Supreme Court's holding in *Jett v. Dallas Independent School District*, 491 U.S. 701 (1989), from bringing an independent cause of action against the defendants pursuant to § 1981 because § 1981 does not provide a direct remedy against state actors.  The plaintiffs acknowledge as much.  *See, e.g.*, Pls.' D.C. Opp'n at 31.  In *Jett*, the Supreme Court held that "the express 'action at law' provided by § 1983 for the 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws,' provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor."  *Jett*, 491 U.S. at 735.  Therefore, although the plaintiffs have no right of action against the defendants under § 1981 directly, they are permitted to sue the defendants under § 1983 to remedy the alleged deprivation of the rights secured by § 1981.[27]

Having established that the plaintiffs are permitted to bring their claim for the deprivation of their § 1981 rights under § 1983, the Court will now address the defendants' argument that the plaintiffs' § 1981 claim must fail because the plaintiffs are not employed pursuant to a contract.

---

[27] In this regard, the defendants misread the holding of *Jett*.  They argue that the plaintiffs' § 1983 claim is "an attempt to circumvent the *Jett* holding," Rubin Reply at 1, but nothing could be further from the truth.  The Court in *Jett* specifically contemplated that plaintiffs who had been deprived of their rights under § 1981 by state actors could sue the state actors responsible for the deprivation through the remedy provided in § 1983.  *See Jett*, 491 U.S. at 735.  The defendants' incorrect reading of *Jett* would absurdly result in all state actors being immune from suit for depriving citizens of their rights under § 1981.

*See* D.C. Mem. at 18–21; Def. Rubin's Mem. of P. & A. in Supp. of Mot. Summ J. ("Rubin

Mem.") at 8–11, ECF No. 48; Def. Palmer's Mem. of P. & A. in Supp. of His Mot. Summ. J.

("Palmer Mem.") at 8–11, ECF No. 47.  The Supreme Court has made clear that "[a]ny claim

brought under § 1981 . . . must initially identify an impaired 'contractual relationship' under

which the plaintiff has rights."  *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006)

(citation omitted).  The defendants argue that "District of Columbia personnel are not hired

pursuant to an employment contract," but rather "they are appointed to public service and their

employment relationship is governed by applicable statutes and regulations, not private contract

principles."  D.C. Mem. at 19.  This argument, "is one frequently raised by the District, but as

often as it has been raised, it has been rejected."  *Graves v. District of Columbia*, 777 F. Supp. 2d

109, 120 (D.D.C 2011); *see, e.g.*, *Wilk v. District of Columbia*, 730 F. Supp. 2d 20, 23 n.3

(D.D.C. 2010); *Hamilton v. District of Columbia*, 720 F. Supp. 2d 102, 114 (D.D.C. 2010);

*Kennedy v. D.C. Gov't*, 519 F. Supp. 2d 50, 59–61 (D.D.C. 2007).  Most relevant to this case, the

D.C. Circuit has held that "members of the District of Columbia Fire Department are the

counterparts of employees of state and local governmental units, rather than federal

employees . . . ., and they retain an independent right of action under section 1981."  *Torre v.*

*Barry*, 661 F.2d 1371, 1374–75 (D.C. Cir. 1981); *see also Kennedy*, 519 F. Supp. 2d at 60

("[E]ven if District of Columbia law provides that [a plaintiff's] public employment is generally

held by statute instead of contract, the federal interest for § 1981 claims predominates in this

situation since '[t]he right to dispose of one's labor freely by contract is at the heart of the

protections afforded by § 1981.'" (quoting *Sagana v. Tenorio*, 384 F.3d 731, 737 (9th Cir.

2004))).

In support of their argument, the defendants rely heavily on two cases:  *Kizas v. Webster*, 707 F.2d 524 (D.C. Cir. 1983) and *Butler v. Pennsylvania*, 51 U.S. (10 How.) 402 (1851).  In *Kizas*, the D.C. Circuit held that FBI employees had no vested contractual right to a "special preference" accorded to clerical and support personnel in making appointments to special agent. *Kizas*, 707 F.2d at 534–37.  In so holding, the Circuit said that "federal workers serve by appointment, and their rights are therefore a matter of legal status even where compacts are made."  *Id.* (internal quotation marks omitted).  The Court went on to say that "'[t]hough a distinction between appointment and contract may sound dissonant in a regime accustomed to the principle that the employment relationship has its ultimate basis in contract, the distinction nevertheless prevails in government service.'"  *Id.* (quoting *Riplinger v. United States*, 695 F.2d 1163, 1164 (9th Cir. 1983)).  The holding of *Kizas*, however, is inapposite for two reasons:  (1) it applied only to *federal* employees, which the Circuit in *Torre* made clear is a critical distinction, *see Torre*, 661 F.2d at 1374–75; and (2) it did not involve § 1981 claims.

The defendants' reliance upon *Butler* is even farther afield.  *Butler* is an antebellum Supreme Court decision that dealt with three Pennsylvania Canal Commissioners who claimed that a Pennsylvania statute, which lowered Commissioners' salaries from $4 per day to $3 per day, violated the Contracts Clause of the U.S. Constitution.  *See Butler*, 51 U.S. at 414–15.  The Supreme Court held that the Pennsylvania legislature had the power to amend the compensation of Canal Commissioners by statute and that the Commissioners had no vested contractual right in earning $4 per day, rather than $3 per day.  *See id.* at 416–17.  Although the Supreme Court arrived at this holding by using some broad language about the nature of public employment, there is little doubt that *Butler*'s holding carries little, if any, weight in interpreting 42 U.S.C. § 1981—a statute that was not even passed until nearly twenty years after *Butler* was decided,

and which was intended to "provid[e] a vehicle for every employee to remedy racial discrimination in the workplace," *Lauture v. Int'l Bus. Machs. Corp.*, 216 F.3d 258, 263 (2d Cir. 2000).  Thus, the Court declines the defendants' invitation to grant summary judgment on the basis that the plaintiffs have not identified an impaired contractual relationship under which they have rights.

With respect to the individual defendants, the plaintiffs must demonstrate that the defendants, while acting under color of state law, deprived them of their rights under § 1981. *See* 42 U.S.C. § 1983.  With respect to the District, the plaintiffs must also satisfy an extra element beyond the predicate deprivation of rights:  They must demonstrate that "the violation of [their] right to make contracts protected by § 1981 was caused by a custom or policy" of the District.  *Hamilton*, 720 F. Supp. 2d at 114 (internal quotation marks omitted); *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978) ("[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.").  Thus, the Court will begin by discussing whether the plaintiffs have established a predicate deprivation of their rights under § 1983 and whether the individual defendants were the ones who caused those deprivations.

Since the plaintiffs' retaliation claim is based upon circumstantial evidence, it is subject to the familiar tripartite burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[28]  *See Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009).  Under that framework, the burden initially falls upon the plaintiff, who must first establish a *prima facie* case of retaliation "by showing (1) that he engaged in statutorily protected activity;

---

[28] The *McDonnell Douglas* framework is, of course, traditionally applied to claims brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et. seq.*  The plaintiffs, however, have chosen not to assert a claim under Title VII for reasons that are not apparent from the record.

(2) that he suffered a materially adverse action by his employer; and (3) that a causal link connects the two." *Id.*  If the plaintiff succeeds in establishing a *prima facie* case, the burden then shifts to the defendant "to produce a 'legitimate, nondiscriminatory reason' for its actions." *Id.* (quoting *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007)).  Finally, if the defendant does so, "the burden-shifting framework disappears, and a court reviewing summary judgment looks to whether a reasonable jury could infer intentional . . . retaliation from all evidence." *Carter v. George Wash. Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004).

Although the parties largely ignore the first element of the *prima facie* case—whether the plaintiffs engaged in statutorily protected activity—the Court will address this element in determining whether summary judgment is appropriate.  To qualify as protected activity under § 1981, a disclosure must complain about "a practice that the employee reasonably and in good faith *believed* was unlawful under [§ 1981]." *McGrath v. Clinton*, 666 F.3d 1377, 1380 (D.C. Cir. 2012).  "Not every complaint garners its author protection under [§ 1981]." *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006).  For example, "ambiguous complaints that do not make the employer aware of alleged discriminatory misconduct do not constitute protected activity." *Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 357 (S.D.N.Y. 2007).

In their Complaint, the plaintiffs say that this protected activity generally involved "opposing race discrimination in the Department, by reporting it internally and filing charges with the EEOC and DCOHR."  Compl. ¶ 60.  In their briefing, the plaintiffs also point to a set of specific examples of what they say were conversations with their superiors in the FIU regarding race discrimination.  *See* Pls.' Rubin Opp'n at 19–20; Pls.' Palmer Opp'n at 23–25.  These examples include:  (1) speaking at a firefighters' union meeting about "the disparity in the unit"

and "detail firemen in the unit with no training," *see* Pls.' Ex. 4, at 119; (2) informing defendant

Palmer that Sgt. Proctor had helped white firefighters cheat, *see* Pls.' Rubin Opp'n at 19;

(3) speaking with Lt. Duck on multiple occasions about "preferential treatment" for white

firefighters, *see* Pls.' Ex. 4, at 96; (4) notifying Sgt. Proctor and Assistant Fire Chief Lee that Lt.

Duck "was retaliating against Plaintiffs for raising questions about Lt. Duck's assignment of

unqualified white firefighters to perform fire investigation and law enforcement tasks," *see* Pls.'

Rubin Opp'n at 19; *see also* Pls.' Exs. 20, 22, ECF No. 55-2; (5) "rais[ing] concerns" about

"problems with fire investigations resulting from the assignment of unqualified white firefighters

to conduct and lead investigations," *see* Pls.' Rubin Opp'n at 19–20; and (6) filing internal EEO

complaints and external EEOC complaints alleging race discrimination within DCFEMS, *see*

Pls.' Exs. 37–38, 41–42.

 There is evidence in the record to support the fact that some of these disclosures took

place, but the substance of the disclosures in the record does not match the characterization of

those disclosure proffered by the plaintiffs.  For example, the record contains evidence that the

plaintiffs complained about Lt. Duck's management style on at least two occasions, and the

DCFEMS also attempted to address that issue internally on two occasions.  *See* Pls.' Exs. 20–22.

The record is unclear at best, however, about whether the plaintiffs' complaints about Lt. Duck

included complaints about race discrimination.  Although the plaintiffs now characterize their

disclosures in race-based terms, the record evidence cited by the plaintiffs indicates that their

complaints within the FIU were not couched in those terms.  For example, plaintiff Bowyer

complained in an e-mail to defendant Palmer and others about Lt. Duck's "passive aggressive

management style" and his "spread[ing] misinformation to officials about me" that had created a

"hostile work environment," but a racial motivation was never mentioned or even implied.  *See*

Pls.' Ex. 20, at 4.  On another occasion, plaintiff Bowyer "vent[ed]" to Assistant Fire Chief Lee

that Lt. Duck had formed a "team" within FIU that excluded him, plaintiff Pennington, and Sgt.

Proctor and that Lt. Duck "attack[ed]" him, plaintiff Pennington "and other members," but again

race was not mentioned.  *See* Pls.' Ex. 22, at 1–2.  None of this evidence supports the assertion

that the plaintiffs spoke out about "preferential treatment" for white firefighters or other racial

discrimination.  The first time the record indicates that the plaintiffs explicitly complained about

race discrimination was in their internal EEO complaints, which the plaintiffs say they submitted

in June 2008.  *See* Pls.' Exs. 37–38.[29]  The plaintiffs made similar complaints in their EEOC

charges in August and September 2008.  *See* Pls.' Exs. 41–42.

Other than the plaintiffs' EEO and EEOC complaints, however, there is no evidence in

the record—aside from the plaintiffs' self-serving deposition testimony—that would permit a

reasonable jury to conclude that the plaintiffs engaged in activity protected under § 1981.  The

record indicates that the plaintiffs' complaints about Lt. Duck's management style and "passive

aggressive" demeanor are not protected activity under § 1981.  *See McGrath*, 666 F.3d at 1380;

*Valles-Hall v. Ctr. for Nonprofit Advancement*, 481 F. Supp. 2d 118, 154 n.23 (D.D.C. 2007) (to

be protected, it must be objectively reasonable for the plaintiff to believe that he was opposing an

employment practice that violated § 1981).[30]  Although the plaintiffs may have speculated

among themselves that the behavior of Lt. Duck and others was racially motivated, there is no

evidence to suggest that their belief was objectively reasonable, and more importantly, there is

---

[29] Aside from the self-serving assertions in the plaintiffs' deposition testimony, there is no evidence to support the fact that the plaintiffs spoke about race discrimination at a firefighters' union meeting, and there is no evidence whatsoever that the plaintiffs informed defendant Palmer that Sgt. Proctor had helped white firefighters cheat.

[30] Assistant Fire Chief Lee indicated in his deposition testimony that the plaintiffs complained to him about "individuals being assigned FIU duties not meeting the requirements," but Lee also testified that the plaintiffs were vague about who was unqualified and why, the complaints involved "throw[ing] out some names and say[ing] that people weren't qualified" in "gripe sessions," and Lee never testified that the plaintiffs complained that this practice was related to racial discrimination.  *See* Pls.' Ex. 18, at 198, ECF No. 55-2.

no evidence that the plaintiffs outwardly articulated that their complaints had a racial dimension until they filed their internal EEO complaints in June 2008. Simply put, an employees' complaints about his boss or his displeasure with the way his workplace is run is not protected activity under § 1981 unless those complaints could reasonably be interpreted to include some nexus to racial discrimination. Therefore, the only protected activities that the plaintiffs have provided evidence of are their internal EEO complaints in June 2008 and their external EEOC complaints in August and September of 2008. Therefore, as to those disclosures, the plaintiffs satisfy the first element of their *prima facie* case.

As to the second element of the *prima facie* case, the plaintiffs' arguments are once again vague and somewhat inconsistent. On the one hand, the plaintiffs contend that the adverse employment action taken against them was, in general, the race-based policy of giving preference to white firefighters in the FIU. *See* Pls.' Rubin Opp'n at 18; Pls.' D.C. Opp'n at 34–38. On the other hand, the plaintiffs also point to the same discrete employment actions that they cited in support of their DCWPA and First Amendment claims (*i.e.*, reassignment to the CSU, removal of privileges, modification of work schedule, removal from BVI). *See* Pls.' Rubin Opp'n at 25–27; Pls.' Palmer Opp'n at 23–25. Giving the plaintiffs the benefit of all reasonable inferences, the Court will construe their argument to be that the adverse employment actions taken against them were the four discrete actions already discussed, which the plaintiffs argue were done *pursuant to* a race-based policy of favoring white firefighters and punishing African American firefighters.[31] Furthermore, as already discussed, *see supra* Part III.A.1, three of those four discrete actions qualify as adverse employment actions for purposes of the plaintiffs' § 1981

---

[31] To the extent that the plaintiffs attempt to craft their § 1981 claim under a "disparate impact" theory, *i.e.*, that the DCFEMS's facially race-neutral changes to the requirements for placement in the FIU had a disparate adverse impact upon the plaintiffs as African Americans, this theory is unavailable under § 1981. *See Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 383 n.8, 391 (1982); *Berger v. Iron Workers Reinforced Rodmen Local 201*, 843 F.2d 1395, 1430 (D.C. Cir. 1988).

claim:  (1) removing the plaintiffs from the Burned Vehicle Unit ("BVI"); (2) taking away the plaintiffs' take-home car privileges and call-back privileges and moving them to an office space that housed the K-9 unit; and (3) reassigning the plaintiffs to the Community Service Unit ("CSU").  Therefore, the plaintiffs also satisfy the second element of their *prima facie* case.

Finally, as to the third element of the *prima facie* case, the plaintiffs run into many of the same problems that undermined their DCWPA and First Amendment claims.  Since the Court has already found that the plaintiffs' only § 1981 protected activity that is supported by record evidence began with the filing of internal EEO complaints in June 2008, it would be impossible for a reasonable jury to conclude that the plaintiffs' protected activity had anything to do with the plaintiffs being removed from the BVI in March 2007 or the plaintiffs getting moved to the K-9 unit and having their take-home care and call-back privileges removed in November 2007.  The reassignment of the plaintiffs to the CSU, however, could have had a causal link to the plaintiffs' protected activity.  Although the Court has already concluded that the plaintiffs' EEOC complaints could not have motivated the reassignment to the CSU because they were not completed until after the reassignment took place, *see supra* Part III.A.2(c), the plaintiffs' *internal* EEO complaints may have played a role in the reassignment to the CSU.

In order for the plaintiffs to successfully establish a *prima facie* causal link between the EEO complaints and their reassignment to the CSU, however, they must also show that the person or persons responsible for the reassignment had knowledge of the protected activity.  *See, e.g.*, *Mitchell v. Baldridge*, 759 F.2d 80, 86 (D.C. Cir. 1985) ("The causal connection component of the prima facie case may be established by showing that the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity.").  The order reassigning the plaintiffs to the CSU came from Assistant Fire Chief

Alfred Jeffrey, though that order was approved by defendant Palmer, *see* Defs.' Ex. A at 95, ECF No. 47-2; Pls.' Ex. 5, ECF No. 55-2, and the record also indicates that defendant Rubin was the one who instructed Jeffrey to give the order, *see* Rubin Decl. ¶ 17.  The plaintiffs offer no evidence, however, that defendants Palmer and Rubin or Assistant Fire Chief Jeffrey were aware of the plaintiffs' EEO complaints before the reassignment decision was made.  In fact, the plaintiffs offer no evidence that anyone outside the EEO Department had any knowledge that the plaintiffs had filed internal complaints at the time of the decision to reassign the plaintiffs.  *See* Pls.' Exs. 37–40, ECF No. 55-2.[32]  The plaintiffs state that there was a "likelihood of management's knowledge of Plaintiffs' protected disclosures" based solely on the fact that the reassignment occurred "[s]hortly after" the protected activity.  *See* Pls.' Rubin Opp'n at 26.  Yet, mere temporal proximity does not, by itself, support a reasonable inference that management was aware of the protected activity.  Indeed, such an inference would essentially eviscerate the plaintiffs' already minimal burden to prove knowledge at all.  Without even a scintilla of evidence on this crucial point, the plaintiffs once again find themselves wholly lacking evidence to support an element of their *prima facie* case.  Therefore, the Court need not go any further in analyzing the plaintiffs' § 1981 claim and must grant summary judgment to the defendants.

Even assuming, however, that the plaintiffs were able to produce evidence that defendants Palmer or Rubin or Assistant Fire Chief Jeffrey had been aware of the EEO complaints before the reassignment decision was made, the defendants have put forth a legitimate, nondiscriminatory reason for the reassignment that has gone unrebutted by the plaintiffs.  Specifically, as discussed previously, the defendants contend that the plaintiffs were reassigned to the CSU "to afford the Department an opportunity to investigate concerns raised by

---

[32] Indeed, neither party has offered any evidence, one way or the other, regarding when, or if, the defendants were aware of the plaintiffs' internal EEO complaints.

the OAG, and in particular, those raised by Deputy Attorney General Robert Hildum."  D.C.

Mem. at 26.  *See generally supra* Part III.B.2.

The plaintiffs offer no evidence to rebut this legitimate, nondiscriminatory reason for the

plaintiffs' reassignment.  The plaintiffs' only rebuttal is to redeploy the very same speculation of

pretext, based solely on temporal proximity, that they attempted to use in establishing their *prima*

*facie* case.  *See, e.g.*, Pl.s' Rubin Opp'n at 26 ("This very close proximity in time is sufficient to

establish that Plaintiffs' demotions were in fact taken in retaliation for their protected

disclosures . . . .").  The plaintiffs also argue that "Dennis Rubin was not informed by Hildum of

Hildum's concerns about Plaintiffs until October 28, 2008."  *See id.* (citing Pls.' Exs. 34–35).

On October 27–28, 2008, the OAG sent letters to defendant Rubin that more fully described the

reasons for the plaintiffs' placement on the Lewis List, *see* Defs.' Reply Exs. B–C, though

defendant Rubin testified that Hildum informed him in person of the decision to place the

plaintiffs on the Lewis List as early as August 21, 2008, *see* Rubin Decl. ¶¶ 3, 8–15; Defs.' Ex. I

at 63:1–64:16.  The fact that Hildum chose later to elaborate formally upon the OAG's concerns

is not enough for a reasonable jury to infer that the defendants' stated reasons for the

reassignment are pretext (which would also necessitate an inference that defendant Rubin

committed perjury in his sworn declaration and deposition testimony).  Furthermore, the

plaintiffs admit that they were notified on June 21, 2008—two months before their reassignment

to the CSU—that they had been placed on the Lewis List "because it was believed that they had

perjured themselves during the Bridgewater case."  Pls.' D.C. Opp'n at 11.  Therefore, even had

the plaintiffs been able to establish a *prima facie* case of retaliation, the defendants would still be

entitled to summary judgment.

**IV.      CONCLUSION**

For the reasons discussed above, the plaintiffs have failed to produce sufficient evidence

to establish one or more essential elements of their claims under the DCWPA, the First

Amendment, and 42 U.S.C. § 1981.  Therefore, the Court will grant the defendants' motions for

summary judgment in their entirety.

An appropriate Order accompanies this Memorandum Opinion.


Date:  December 20, 2012


_/s/ Beryl A. Howell_
BERYL A. HOWELL
United States District Judge